## THE STATE v. JOHN WOOLEY, Appellant.

### Division Two, January 4, 1909.

1. **CORPUS DELICTI: Extra-Judicial Confession: Extrinsic Evidence.** Where there is positive evidence that deceased died, that prior to her death she had received serious physical injuries, and that her death resulted from the injuries, as is shown by the testimony of numerous reputable witnesses, and defendant in an extra-judicial confession stated he inflicted the injuries, the proof of the *corpus delicti* does not rest upon his confession alone, and the case should go to the jury.

2. **JURORS: Conscientious Scruples: Since Amendment of Statute.** The court should exclude from the panel, in a first-degree murder case, jurors who have conscientious scruples against inflicting the penalty of death, since as well as before the amendment of 1907 to the statute, R. S. 1899, sec. 1817, making it optional with the jury, when they find defendant guilty of murder in the first degree, to assess his punishment at death or life imprisonment.

3. ———: **General Challenge.** A general challenge for cause of a juror, without stating the specific ground of his disqualification, is the same as no challenge at all.

4. ———: **Opinion Formed: Newspaper Reports.** A juror who has formed an opinion of defendant's guilt from reading newspaper reports of the crime and extracts from his confession published in those newspapers, which confession is denied by defendant at the trial, and who has expressed that opinion, but states that such opinion would not prejudice him in the trial of the cause or prevent him from giving defendant a fair and impartial trial or from rendering a verdict upon the evidence developed at the trial under the instructions of the court, is not disqualified.

State v. Wooley.

5. **INDICTMENT: Motion to Quash: Incompetent Witnesses.** A motion to quash the indictment does not constitute a part of the record proper. To properly preserve it and the ruling of the court thereon for review, it must be embodied in the bill of exceptions. So that where defendant filed a motion to quash the indictment on the ground that the names of certain witnesses were not indorsed thereon, and on the ground that defendant and his wife were called before the grand jury and sworn and the indictment was found upon their testimony and their names were not indorsed thereon, neither such motion nor the rulings of the court thereon, if not preserved in the bill of exceptions, can be reviewed on appeal, although the record proper shows the motion and the court's rulings and the exceptions thereto.

6. **INSTRUCTIONS: Refusing Defendant's: Murder Case.** Where the instructions given cover every phase of the case to which the testimony is applicable, it is not error to refuse instructions asked by defendant, though they be correct declarations of law.

7. **———: Barbarity: Confining Case to Murder of First Degree.** Where the defendant was either guilty of murder in the first degree or not guilty of any offense, and if guilty his crime was that of the barbarous and cruelly atrocious one of murdering a little stepdaughter twenty months old, the court does not err in confining the case to murder in the first degree. Where the punishment inflicted on a helpless child for a slight offense is outrageous in its nature, or is so out of all proportion to the child's offense as to be considered the effect of a brutal and diabolical malignity rather than of human frailty, it is barbarous and has in it all the elements of malice. So that where the evidence shows that defendant's stepchild twenty months old died from a violent beating and blows upon the head and face, and defendant, if his confession was properly admitted in evidence, inflicted those blows and beating, the court did not err in confining the instructions to murder of the first degree; for, the child was incapable of doing any act that could be made the basis of a provocation sufficient to reduce the killing from murder in the first to murder in the second or to manslaughter in the fourth degree, and the injuries were equivalent to a deliberate act of slaughter.

8. **———: Reasonable Doubt.** Where the court has given a correct instruction, in approved form, on the subject of reasonable doubt, it is not error to refuse an instruction on the same subject asked by defendant, though it is in the form of an instruction formerly approved by this court.

9. **———: Circumstantial Evidence.** Where the facts developed at the trial clearly indicate that the testimony relied upon for

a conviction does not consist of circumstantial evidence alone, then it is not error to refuse an instruction on the subject of circumstantial evidence.

10. **CONFESSION: In Charge of Officers: Admissibility.** A confession made by defendant to officers while in their charge and surrounded by them alone and made in response to frequent questioning by them, if free from any inducement, threats or promise of reward or the hope thereof held out to him by them, is voluntary and admissible in evidence against him.

11. ————: **By Wife: Against Husband.** The wife is not a competent witness against her husband in a criminal case, and cannot be introduced by the State as a witness to testify against him; but a statement made to officers by the wife in defendant's presence, and after being reduced to writing read to him in her presence and signed by her, and acknowledged to them by him to be correct and true, is admissible against him, just as is any other admission. It is not admissible as a confession by her; nothing is added to its force or effect by the fact it was reduced to writing; it is admissible solely because defendant acknowledged that it was a correct and truthful statement of his connection with the crime. Had he remained silent, it could not have been used against him.

12. **MURDER: Insufficient Evidence: Conflict.** Where there is substantial evidence to support the verdict, and substantial evidence that defendant did not commit the crime, it is for the jury to settle the conflict, and a verdict of guilty will not on appeal be disturbed on the assigned ground that the evidence is insufficient to support it.

Appeal from Buchanan Criminal Court.—*Hon. A. D. Burnes,* Special Judge.

AFFIRMED.

*Motter & Shultz* and *Neville & Grier* for appellant.

(1) It is settled law in this State that no person can be convicted of a crime upon his extra-judicial admission alone. There was a failure to prove a *corpus delicti* in this case. The *corpus delicti* must be proved by evidence independent of the extra-judicial confession or admission. Robinson v. State, 12 Mo. 592; State v. Scott, 39 Mo. 424; Pitts v. State, 43

Miss. 472; People v. Frank, 83 Pac. 578; Hatchett v. Com., 76 Va. 1026; McBride v. People, 37 Pac. 953; Dressen v. State, 59 N. W. 1024; State v. Nesenhener, 164 Mo. 461; Wilson v. State, 53 S. W. 122; Brown v. State, 5 So. 626; MacNamee v. State, 34 Neb. 288. (2) The court committed error in admitting the defendant's and wife's confession in evidence, as they were procured under circumstances which make them involuntary. It was error to give the wife's statement to the jury with her signature attached. Biscoe v. State, 67 Md. 6; State v. Walker, 34 Vt. 296; People v. Phillips, 42 N. Y. 200; State v. Day, 55 Vt. 510; 6 Am. and Eng. Ency. Law, 530, 531; State v. York, 37 N. H. 175; State v. Carson, 36 S. C. 524; Green v. State, 15 So. 10; Com. v. Myers, 36 N. E. 481; Com. v. Preece, 140 Mass. 276; Com. v. Nott, 135 Mass. 269; Jones v. State, 58 Miss. 349. (3) The court erred in not submitted to the jury (a) murder in the second degree; (b) manslaughter; (c) and mistreatment of an apprentice. State v. Young, 119 Mo. 495; State v. Phillips & Ross, 24 Mo. 486; State v. Wilson, 98 Mo. 448; State v. May, 142 Mo. 151; State v. Tabor, 95 Mo. 595; State v. Holme, 54 Mo. 161; State v. Foster, 61 Mo. 552; State v. Lane, 64 Mo. 322; State v. Anderson, 98 Mo. 472; State v. Curtis, 70 Mo. 599; State v. May, 172 Mo. 649; State v. Musick, 101 Mo. 271; State v. Shock, 68 Mo. 563; Taylor v. State, 57 S. W. 812; State v. Highland, 144 Mo. 302; State v. Anderson, 86 Mo. 315; State v. John, 172 Mo. 220; State v. O'Hara, 92 Mo. 59; R. S. 1899, sec. 1857. (4) The court committed error in not quashing the indictment for the reason that defendant's wife testified before the grand jury, which indicted him, without defendant's consent, and for the reason that the names of all the witnesses who testified before the grand jury were not indorsed on the back of the indictment. (5) The court committed error for the following reasons: (a) For refusing to permit certain jurors to qualify

on the panel because they stated that they believed that punishment by death was too severe and that they believed in punishment by imprisonment; (b) for the reason that certain jurors were permitted to qualify on the panel who stated that they had formed an opinion and believed at that time that defendant was guilty, and that it would require evidence to remove that conviction; (c) for the reason that they stated that they had read the confessions of the defendant and his wife as published in the newspapers, which were copies of the confessions as introduced in evidence in the case.

*Herbert. S. Hadley*, Attorney-General, and *John Kennish*, Assistant Attorney-General, for the State.

(1) The court did not err in overruling the motion to quash the indictment. 1. The names of nine witnesses are indorsed on the indictment. Upon the hearing of the motion to quash the indictment it was admitted that three witnesses, therein named, appeared before the grand jury and testified, whose names were not indorsed on the indictment. No evidence whatever was offered to show that the State had purposely refrained from indorsing the names of such witnesses, and the State, upon such hearing, offered to indorse such names upon the indictment, with the defendant's consent, but the defendant objected. Neither of the said three witnesses testified against the defendant at the trial. State v. Barrington, 198 Mo. 23. 2. The record shows that defendant did not testify as a witness before the grand jury, and while it is optional with the defendant in a criminal case whether or not the husband or wife shall be permitted to testify, it has never been held a sufficient basis for a motion to quash an indictment that the husband or wife of the defendant, or even the defendant, testified as a witness before the grand jury. 3. The motion to quash the indictment is not included in the bill of exceptions, and, therefore, is not before this court for considera-

tion. State v. Tooker, 188 Mo. 438; State v. Finley, 193 Mo. 202; State v. Coleman, 199 Mo. 112. (2) It is well settled that a general challenge for cause as to the qualifications of a juror, without stating the specific ground thereof, is not sufficient under the law to preserve the question for review in this court. State v. Meyers, 198 Mo. 248; State v. Taylor, 134 Mo. 142; State v. McGinnis, 158 Mo. 118; State v. Miles, 199 Mo. 545. While ten of the panel had formed or expressed an opinion as to the guilt or innocence of the defendant, based upon newspaper report and published extracts of an alleged confession, it is shown in each case that such opinion would not prejudice the juror in the discharge of his duty or prevent him from rendering a fair and impartial verdict upon the evidence under the instructions of the court. State v. Gartrell, 171 Mo. 489; State v. Darling, 199 Mo. 168; State v. Forsha, 190 Mo. 296; State v. McCarver, 194 Mo. 717; State v. Taylor, 134 Mo. 141. (3) 1. The confession of an accused person is prima-facie admissible in evidence. State v. Stebbins, 188 Mo. 387; State v. Hottman, 196 Mo. 110. And as there was an entire absence in the evidence of improper conduct on the part of the officers procuring the confessions, to induce defendant to make them, by the flattery of hope or promise of immunity or reward, or the use of any threats, they were properly admitted in evidence. The mere fact that defendant was in charge of an officer, did not render the statements made by him inadmissible in evidence, if they were not induced by threats or promises of reward or the hope thereof. State v. Barrington, 198 Mo. 23; State v. Stebbins, supra; State v. Church, 199 Mo. 605; State v. Ruck, 194 Mo. 416. 2. Defendant's wife made a written statement of the facts relative to the infliction of the injuries upon the child, and this statement, when read to defendant, he expressly admitted to be true, with

215 Sup—40

one or two exceptions. Defendant thus adopted the written statement as his own, and thereupon it became admissible against him and under the same rules of evidence as though his wife were in no manner connected therewith. There is no question of the privileged character of confidential communications between husband and wife, presented, for any such question was expressly waived by defendant when he acknowledged the statement to be true, in the presence of his wife and third parties. This is not a case in which it is sought to introduce, against the defendant, a declaration or admission of the wife made in the husband's presence, under the rule that by his silence he assented thereto, and thereby made it admissible in evidence against him, as in the case of State v. Burlingame, 146 Mo. 207, and the case of Bank v. Nichols, 43 Mo. App. 385, where it was held that the presumption arising from silence did not obtain in such case. It is of no materiality whether the written statement was made by the wife or a stranger, for when it was read to the defendant and adopted by him, it then became his statement and falls within the general law as to admissibility of admissions and declarations against interest. 1 Ency. of Evid., 562; Long v. Martin, 152 Mo. 688; Reed v. Reed, 101 Mo. App. 176.

FOX, J.—This cause is now pending in this court upon an appeal by the defendant from a judgment of conviction in the criminal court of Buchanan county for murder in the first degree. At the March term, 1907, of the criminal court of Buchanan county, an indictment was returned by the grand jury, charging the defendant, John Wooley, with the murder of his stepchild, Pearl Smith. Anna Wooley, wife of the defendant, John Wooley, was charged in the indictment as an accessory before the fact. The charge upon which the judgment in this cause is predicated is thus made by the indictment returned by the grand jury:

"*State of Missouri, County of Buchanan,* ss.

"In the Criminal Court of Buchanan County, at the March Term, thereof, 1907.

"The grand jurors of the State of Missouri, within and for the body of the county of Buchanan aforesaid, being duly empaneled and sworn, upon their oaths, do present that John Wooley on or about the 2d day of February, 1907, at the county of Buchanan and State aforesaid in and upon one Pearl Smith, then and there being feloniously, wilfully, deliberately, premeditatedly, on purpose and of his malice aforethought, did make an assault, and with his two hands and clenched fists, her the said Pearl Smith, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought did slap, strike, beat and hit in and upon the face, head, breast and body of her the said Pearl Smith, and with his two hands, her the said Pearl Smith, feloniously, wilfully, premeditatedly and of his malice aforethought did seize and take up and knock, cast, throw and hurl the body, face and head of her the said Pearl Smith, with great force and brute violence, down upon the hard wooden floor then and there being, giving to the said Pearl Smith, then and there with the hands and fists aforesaid and by the knocking, casting, throwing and hurling against the wooden floor aforesaid, in and upon the face, head and body of her the said Pearl Smith, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought, mortal wounds and bruises of which said mortal wounds and bruises the said Pearl Smith from the second day of February, 1907, until the sixth day of February, 1907, in Buchanan county aforesaid, did languish and languishing did live, on which said sixth day of February of the year aforesaid, of the mortal wounds and bruises aforesaid, the said Pearl Smith died; and so the grand jurors aforesaid, upon their oaths aforesaid, do say, that the said John Woo-

State v. Wooley.

ley, her, the said Pearl Smith, in the manner and by the means aforesaid, feloniously, wilfully, deliberately, premeditatedly and of his malice aforethought, did kill and murder.

"And the grand jurors aforesaid, upon their oaths aforesaid, do further present and charge that Anna Wooley, before the said felony and murder was committed in the manner and form aforesaid, and by the means aforesaid, at the time and place aforesaid, then and there being, did then and there unlawfully, feloniously, wilfully, deliberately, premeditatedly and of her malice aforethought counsel, aid and abet and comfort and maintain him the said John Wooley, the said felony and murder aforesaid, in manner and form aforesaid and by the means aforesaid, at the time and place aforesaid, to do and commit; and the grand jurors aforesaid upon their oaths aforesaid do say that John Wooley and Anna Wooley, her the said Pearl Smith at the time and place aforesaid in the manner and by the means aforesaid, feloniously, wilfully, deliberately, premeditatedly and of her malice aforethought, did kill and murder, contrary to the form of the statute in such cases made and provided and against the peace and dignity of the State.

"CHARLES F. KELLER,
"Prosecuting Attorney.

"A True Bill.
"J. C. WYATT, Foreman."

At said March term, 1907, of said court, the defendant, John Wooley, filed his application for a change of venue on the ground of the bias and prejudice of the regular judge of said court against him, which application was sustained by the court, and Hon. Alonzo D. Burnes, judge of the Fifth Judicial Circuit, was called as special judge to try the cause. At the June term, 1907, of said court, before the said special judge, the defendant filed a motion to quash the indictment,

which motion was overruled by the court, whereupon the defendant was duly arraigned and entered his plea of not guilty. After said arraignment at the June term, as before stated, the defendant was put upon his trial.

The testimony on the part of the State developed at the trial tended to establish substantially the following state of facts:

The defendant, John Wooley, at the time of the alleged homicide, was a farmer and laborer, about twenty-eight years of age, and had resided in Buchanan county, Missouri, almost all his life. He was married to Mrs. Anna Smith at St. Joseph in said county on the — day of October, 1906. He had one child, a daughter, by a former marriage. His wife, Anna Wooley, had formerly been married to a man named Smith, and Pearl Smith, the deceased, was a daughter by such marriage. At the time of his marriage to Anna Smith, the defendant was working in a packing house in St. Joseph, and Anna Wooley, before her mariage, was working out in South St. Joseph. Pearl Smith, the deceased, was about twenty months of age at the time of her death. While her mother worked out, and during the greater part of her life, the deceased had lived with her grandmother, on her mother's side, Mrs. Dively, who lived with her husband in said city of St. Joseph. Shortly after the marriage of the defendant to Anna Smith, they went to housekeeping in said city and took the child, Pearl Smith, and also the defendant's daughter, with them to their home.

A few weeks after their marriage, the defendant and his wife moved from St. Joseph to the town of Wallace, in said county, where they lived but a few days, and then moved to and located on a rented farm near the town of Faucett, in said county, at which place they lived until the death of Pearl Smith, a few months thereafter. While the defendant and his wife were moving around, Pearl Smith was left with

her grandmother part of the time. After locating on the farm, and about the 27th of December, 1906, the defendant and his wife got the child, Pearl Smith, from its grandmother and took it with them to their home. The child was then healthy and well developed for its age. The defendant several times punished the child by slapping it, and at one time threatened to kill it. The child's life was insured in favor of Mrs. Dively for the sum of $150.

On the 21st day of January, 1907, the defendant and his wife drove to the city of St. Joseph and to the home of Mrs. Dively, taking the child, Pearl Smith, with them. The defendant did not want to go into the Dively home, but finally did so. The child was so lacerated and beaten about the head, face and body as to be almost unrecognizable. One of its eyes was beaten and bloodshot, its ears bruised and beaten until they stood out from the head and were swollen shut. The skin was blackish red in color. The child's right hip was beaten and mashed in. There were bruised and discolored places on its side, groin, arms and legs. Mrs. Dively asked the defendant and his wife if they had had a doctor, and they answered that they had not, but that they had been doing what they could for the child. The defendant told Mrs. Dively that the child had been hurt by falling out of a high-chair; and he also stated that while he was at a spring cleaning it out, and his wife was out milking, someone had come to the house and had beaten up the child, and that he would give anything to know who had done it. Mrs. Dively insisted that a doctor be called, and finally the defendant telephoned for a doctor, who came and gave the child medical attention. The defendant remained at the Dively home until after dinner the next day, at which time he went home, leaving the baby and its mother at the home of Mrs. Dively, where they remained from Monday till Saturday of that week. During the week the child remained with its grand-

mother it began to improve, and got so it could eat and drink milk. The mother and child then returned to their home on the farm. About ten days thereafter, on the 6th day of February, 1907, the child died. In addition to the bruises, injuries and marks of violence on the body of the child when it was taken to St. Joseph, other bruises and marks of a later date were found after its death.

The physician who attended the child before its death, and the physicians who held the post-mortem examination, each testified that, in his judgment, death resulted from the injuries the child had received, as shown by the bruises and marks on its body.

The day after the child's death the defendant told a neighbor that the child's life was insured for the sum of $150, and asked what he should do.

An inquest was held upon the body of the child, and the defendant and his wife were arrested and placed in jail in separate cells at the city of St. Joseph. While in jail, the defendant made a statement, in writing, admitting that he had beaten the child and inflicted the injuries which the physicians had testified had caused its death. The wife also made a statement, in writing, giving a detailed account of the infliction of the injuries upon her child by the defendant, and he admitted that it was true, except as to one or two matters, which were immaterial. These statements were read in evidence and will be reproduced in full after proper reference is made to the testimony of witnesses, laying the foundation for their introduction.

Many witnesses were introduced on behalf of the defendant as to the condition of the child, before and after its death, and to prove the good character of the defendant. The defendant was also a witness in his own behalf, and denied the truth of the statements contained in the written confessions offered in evidence, and denied that he was in a clear and rational

state of mind when he made and signed the said statements. He denied that he went into the house on Friday evening, in the absence of his wife, and inflicted the bruises and injuries upon the child, Pearl Smith.

This being a case of such importance it is not out of place to at least indicate the substance of the testimony of a number of the witnesses testifying in this cause.

On the part of the State Mrs. Esther M. Dively was introduced and she testified substantially as follows: My name is Esther M. Dively. I live at 816 Sycamore, and lived there during the months of October, November, December, January and February, and live there now. My husband's name is George M. Dively. Anna Wooley is my child. I know John Wooley, and first met him in our home sometime in October, I think. He came from South St. Joe with Anna. Anna Smith and John Wooley were afterwards married, in November I believe. He was working at a packing house in South St. Joseph at that time. After the marriage they lived in South St. Joseph about three weeks. I knew Pearl Smith. She was my grandchild, and Anna Wooley's own child. While John Wooley and his wife lived at St. Joseph, part of the time I had the child, but after they got things kind of straightened around, they came and took the child down there, and kept it two or three weeks with them. After that they moved to Wallace, Missouri, and lived there a few days; that is in Buchanan county, I reckon. While they were moving around, they would bring the child, Pearl Smith, there and leave her with me. From Wallace they went out near Faucett, Missouri, and moved upon the farm of Mr. McDaniel. After they moved out there, they came into St. Joseph here and took the child out to Faucett, Missouri. It was on the 27th of December that they took the child from me the last time. The child was then stout and hearty, just

as stout and hearty a child as there was in St. Joseph. It was about eighteen months old. Had dark brown hair, hung along its neck and ears in curls. The child had been with me more than two-thirds of the time since its birth, and all of the time from last May until the 27th day of December, except one or two weeks, when she took it with her and went to see her brother. During all that time it was a healthy child. I next saw the child after the 27th of December, on the 21st of January. They brought it to our home. They got to our home between four and five o'clock in the evening, I should judge. John Wooley and Anna Wooley brought the child. The child was so lacerated and beaten up that I did not know it. The first I saw of the little thing was its head. Its left eye was beaten where someone had struck their fists in it, and behind both little ears was beaten and bruised all to pieces, until the little ears just stuck out from its head and was all swollen shut, and looked like it was mashed into a jelly, around its little head and both ears. The interior of the ear looked red and bruised. It was bruised until it looked black-red on the inside of its little ears. The hip was all beaten and mashed in and it had great big marks on its little side. They looked like great big marks where it had been hit across the back, and its little groin here was all bruised and turned green, and this other side had marks on it, and this arm here was all big marks across it. It had marks on both arms, looked like where anything had mashed it. Its other arm looked like it had been held or mashed in, and its leg here had big marks across it where it had been bruised. There must have been three or four marks across its legs below its knees and stockings; and its eye was just awful. Wooley and his wife came to the house. I saw them drive up, and I went out and took the baby, and Anna got out and came on in pretty soon, and Wooley, he stayed out there. He didn't want to come in, and so I took the

baby on in the other room, where Mr. Dively was. He was crippled, and couldn't walk; and of course, all that was said and done for a little bit after I saw the child, I don't know as I could tell you. I cannot tell you, for it overcame me so that I could not stand on my feet hardly, to see the little innocent thing hurt that way. Wooley came in right after Anna had brought the baby in. I asked them if they had had any doctor, and they said no, that they had been doing all that they could for it, and they told me then how it happened, how they said it happened. John Wooley told us, and so did Anna, that the child fell out of the chair. John Wooley told me that it fell out of the high chair, and he told me that while he was at the spring cleaning out the spring, while Anna was 'tending to the milk, that someone came there and did it, and he said to me that he would give anything to know who did that. That is the way he talked to us. I was fixing something to eat when they came, and so we got our supper over, or dinner, and I said to them, wasn't they going to have no doctor, and I went on back in the front room, and had the baby there by the heating stove, and he said he didn't know as there was any use in getting a doctor, that they were doing all they could, and I says, "There has got to be a doctor brought," and he said he didn't have no money to pay a doctor bill, or to pay for medicine, and I says, "Mr. Wooley, it don't make no difference, money or no money, this baby has got to have a doctor," and he was out of doors there for a little bit, and he came in, and it was getting late in the evening, and I says, "Ain't you going to get a doctor?" And he said, he didn't know that it was any use to get a doctor. And I says, "Mr. Wooley, you don't sleep tonight, nor me neither, tonight, until there is a doctor brought here to see this baby;" and he said he didn't know where to get any doctor; and I says, "If you can't get no other doctor, go and phone Dr. Pentz; he has come to us several

times without any money, and go and phone to him."
And so he then went and phoned to the doctor. The
doctor came down and examined the child. They told
him what had happened to the child, about the same as
they did us. The doctor took Wooley with him to the
drug store, and got some medicine fixed up for the
baby. Wooley brought the medicine back and stayed
all night and stayed until the next day, came up town
during the forenoon, and then he came back and eat
his dinner, and then he told us he was going home, and,
of course, he went home. He left Anna and the baby
there. The baby remained at our house until the next
Saturday evening, between four and five o'clock. The
baby was there from Monday until Saturday, and it
had gotten quite a bit better. It had got so it would
eat and drink its milk, and at a time or two it got down
and tried to play, but it was so weak and tottery that
it couldn't walk but a step or two at a time, but it was
getting some better. I last saw it on the 27th of De-
cember, and it had nice long hair. When it was
brought back to me on January the 21st, it had no hair
at all. The hair had all been taken off of its little
head. I next saw the child the night after it died. It
died one night and I didn't get to see it until the next
night after dark. I looked at the body of the child
after it was dead. The old bruises were still there,
to a certain extent, but then its little wrist here looked
like it had been all mashed in, and its little mouth was
all sore, and looked like it had been bleeding, and its
little jaw here was all bruised and sunk in, and mashed,
like it was broken or mashed clear in, and the back of
its little head here looked like it had had hard blows
from some source on it. I couldn't examine it all over,
but I examined to see that it was all bruised there in
that place, and then on its little cheek. I didn't strip
the little thing off, after I went down, to see how its
body looked, but that awful bruise on the side of its

head and face, and down on its throat and on the top of its head, I saw them.

Mr. S. B. Farris testified and said: I live in Central township in the southeast corner about two miles and a half northeast of Faucett. I know John Wooley. Got acquainted with him in 1906, close to the latter part of the year 1907. He was living close to me, about a quarter of a mile away. I never saw Pearl Smith alive, and didn't know Mrs. Wooley only just to see her. I am not positive as to the night Pearl Smith died, but believe it was on Wednesday night. I do remember of the fact of her dying. About ten days before she died, John Wooley came over to my place and told me to call Dr. Hull for him, that his wife and baby were both sick. I called the doctor for him again the night the child died. Mrs. Wooley asked me to call the doctor that time. I did not see the child the next day after it died. I saw it the second day following. I was a member of the coroner's jury, and did not view all of the body, only its face and head. I noticed on the right jaw bone a sunk place there, apparently about the size of a nickel, and then behind the left ear was a place there something like a lead pencil, and somewhere near an inch long. I don't remember the condition of the ears. I noticed that its lips were a little sore, and on its nose there was some apparently fresh scratches; they seemed to be fresh.

E. L. McDaniel, a witness for the State, gave testimony substantially as follows: I live near Faucett in the south part of the county, and know John Wooley. During the months of January and February he was living in Jackson township in my house. He was working on the farm for my son. I remember the death of Pearl Smith, and had a conversation with Mr. Wooley about that time. It was the morning after the child died. It was on the road close to the farm that I met him. I asked him how his folks were, and he told me that the child died the night before. He said he was

going over to my son's to see about getting a team to go after a coffin and getting some money.

"Q. And what else did he say about that, if anything?

"Mr. Schultz: We object to it.

"The Court: The objection is overruled. To which ruling of the court defendant excepted at the time and still excepts."

I don't know that he was going to borrow money; he said he was going to see about getting some money, and he told me that the child's life was insured, and asked me what he would have to do. And I told him I didn't know, but I thought he would have to get a certificate from the undertaker or doctor, or something. He said the child's life was insured for $150.

Dr. W. S. Hull was also introduced by the State and testified as follows: I reside at Faucett, Missouri. Am a physician.

"Mr. Schultz: We would like to ask the doctor a question or two, preliminary to the offering of an objection.

"The Court: Yes, sir.

"Mr. Schultz: You are the family physician of the defendant, and was called to his home to treat Pearl Smith, were you not, at the time the child died?

"A. Yes, I was called there the night she died; yes, sir.

"Q. As his physician? As his family physician? You went there as the family physician of the family? A. Yes, sir.

"Mr. Schultz: We wish to offer an objection to the doctor testifying in this case, on the ground of the privileged nature—the relationship between the defendant and the witness.

"The Court: Not unless he was the doctor of the defendant. If he was the doctor of the defendant, waiting on him, as to any information he got from the defendant, your objection would be well taken; but if

he was waiting on the child, there was no relation existing between the doctor and the defendant. The objection is overruled. To which ruling of the court defendant at the time excepted and still excepts.''

I was called to John Wooley's house to wait upon Pearl Smith about the 28th of January. I was called there to see Mrs. Wooley, and then I saw the child, Pearl Smith. I saw Mrs. Anna Wooley and John Wooley and Pearl Smith. I made no special examination of the child at that time, but I detected some bruises on the left side of its head and ear, and also on the back of its head—the skull—and one of its eyes was bruised, although I didn't examine that thoroughly at the time. They didn't ask me to. I was called there next on the 6th of February, 1907. The child was in a dying condition. John Wooley was holding this baby in his arms, and there seemed no life in the baby, except in its left arm, and I made a few contractions of its left arm before it died. I was there probably fifteen to thirty minutes before the child died. There was some bruises on its left arm. That was the arm that would contract. There were three or four, not deep bruises, on the arm, but then they were prints, like there had been compression on that arm. They almost encircled the arm, and seemed to be mostly on the back and top of it. I also noticed these old bruises. I examined those on its head and on the back of its head, and between the skin and the bone, there was something there; there was a bulge of some kind, because you could get it by pressure—a crepitation. The wound on the left side of the head and ear was, I suppose, about three inches square, probably, just to guess at it, and on the back of its head it seemed like it covered a good part of it. I don't know how large, exactly, there was considerable of a bruise. I didn't examine its body any further than from its arm down. I didn't strip the body. There were also bruises on its left hip. There was

a contused wound of the lip, and the under part of the upper lip was cut; it was probably the teeth or something that had cut the under part of the upper lip. The bruise from the mouth extended from the lips. The lips were swollen to a certain extent. There were marks on the left side of its face. They seemed to be fresh marks. There were three or four of them about one-fourth of an inch wide, and they were on its cheek over its mouth. I could see the prints on the side of its face—marks—and its mouth was contused or mashed. There were some of the wounds that were of an older standing than the others, and that is as far as I can tell. Some of the wounds were made later, especially this one on its face. That one, and that one on its arms, seemed to be the most recent. These others on its head, I couldn't tell. The defendant didn't say much about the child that night.

"Q.  As a physician, doctor, I will ask you if the condition in which you found this child on this night— the bruises and wounds—were sufficient, in your judgment, to produce death?  A.  From what I saw that night, and these bruises, it was my opinion that these injuries were sufficient to cause death."

Dr. Hull upon being recalled, further testified that Pearl Smith died in Buchanan county, Missouri, on the 6th day of February, 1907.

Dr. C. F. Byrd was introduced by the State, and said: I am the coroner of Buchanan county, and, as such coroner, went to the house of Mr. Wooley, the defendant in this case, and found there a dead baby. I held an autopsy. The heart was in a normal condition, also the lungs. I examined the body and it would be hard to locate all the bruises on the child. They were numerous. I found bruises all over the little body. The most severe bruise was on the left side of the head. The bruise was on a portion of the head, and extended down a little on the neck behind the ear. The scalp was bruised; the skin was discolored, dark,

and spots on its face—bruised places—and an abrasion on its nose, and the little body was covered with dark bruised places, different degrees of intensity, the bruises were. I examined the body subsequently on the 13th of the same month. We got the body at the cemetery, and brought it to St. Joseph, and on the following morning, the second autopsy was held. Dr. McCoy, Dr. Forgrave, Dr. Bansbach, Dr. Pentz and myself were present, and I have the original memoranda. The scalp was removed from the skull, and the top of the skull was sawed off—taken off; when the skull was removed it showed extravasated blood in great quantities beneath, and showing on the periosteum on the left side. The bruise showed on and under the periosteum to the bone of the skull, and the blood was settled all under this membrane, under the scalp, a gelatin mass of clotted blood, or extravasated blood. The right side was in a similar condition, only not quite so bad. The bruises extended down beneath the ear here, and showed somewhat beneath the periosteum. There were lacerations on the inside of its lips; and the inside of the cheeks were lacerated, or cut; there were bruised spots on the hips, and a bruised spot on its arm. That was probably three or four inches long, and maybe two inches or three inches wide. That was on the left arm. It was a solid mass of bruises, and there was a small abrasion—well, I believe you have that; the abrasion on the nose. These abrasions or lacerations looked to have been cut by the teeth; both inside of the cheek and lips. There was a bruise, probably two inches and a half long and a half of an inch wide, over the right temple, and there was a skin abrasion or bruise on the right ear. The left side, here, was bruised back of the temporal bone (indicating on the face), bruised sufficiently to show up under the skin, dark; skin discolored. There were small spots all over the body, differing in size, on the legs and body. It is my opinion that there were bruis-

es there sufficient to cause death—injuries sufficient to cause death.

Dr. J. J. Bansbach gave testimony, which was substantially as follows: I am a doctor of medicine, located in this city. Have held the office of coroner one term. Was called upon about the 11th or 12th of February, 1907, to assist in an autopsy on a child, known as Pearl Smith, and participated in the autopsy. The bruise was the most severe of all, in my opinion.

Upon cross-examination the doctor was questioned as to the written report of the autopsy, and this report, as made by the physicians participating in the autopsy, was as follows:

"Autopsy held on the body of Pearl Smith. Aged 20 months, Feb. 13, 1907, at Sidenfaden's Morgue.

"The following conditions were noted on inspection:

"Bruise and contusion over left parietal region and over mastoid region; four skin abrasions over same; looks not to have been caused by a hard instrument; bruised on forehead on either side; nose is bruised; one-half inch skin abrasion right of eye one inch from eye; abrasion and bruise on upper lip, right side; lacerated as though cut by teeth; bruised badly over left side of lower jaw; bruise one and one-half inch by two inches over right temple; skin abrasion with bruise on right ear; abrasion on inside of left cheek, apparently caused by bruise on outside of cheek; left cheek, bruised in several places; small scratch on external side of right wrist; bruise size of a quarter on back of right hand, and one on outer side of right forearm; bruised on front and sides of chest and lower ribs; three scratches across left fore-arm three-quarter inch each, extending over half way around arm; yellow stain on back of left fore-arm; skin thickened, two large bruises over left hip; bruise size of dime over right hip and one on right knee; several small places

215 Sup—41

resembling bruises on lower left leg; bruises on back of left hand size of a quarter; small abrasion one-half inch on left side of genitals; extensive ecchymoses and extravasated blood over entire left side; right side in similar condition, but not so extensive; all bruises showing on periosteum underneath the scalp; on removal of vault of the cranium found no injuries to brain or membrane; one-half ounce of venous blood and a few small clots found in right occipital fossa within the skull.

"In our opinion death was due to shock following the injuries received.

"J. H. McCoy,
Wm. E. Pentz,
C. F. Byrd, Coroner,
H. S. Forgrave,
J. J. Bansbach."

Dr. H. S. Forgrave testified as follows: I am a practitioner of medicine of the regular school, and am located at St. Joseph, Missouri. I was called upon to assist in an autopsy over the body of Pearl Smith, on February 13, 1907. (The witness then described at length the condition of the body of Pearl Smith.)

"Q. As a physician, doctor, I will ask you to state, in your opinion, as to whether or not the injuries which you have just described, found upon the body of Pearl Smith, were sufficient to produce death? A. They were.

"Mr. Schultz: We object to that question and answer, for the reason that it is immaterial and irrelevant, and has no bearing on this case.

"Objection overruled. Exception.

"A. From my examination of the body of Pearl Smith there were no other apparent causes of death present than those which I have described and mentioned."

Dr. J. M. Bell testified concerning an analysis of the stomach of Pearl Smith. His statement was as follows: I am engaged in the practice of medicine and know Dr. Byrd. I have been practicing medicine fourteen years at St. Joseph. During the month of February, Dr. Byrd brought to me the stomach of a child, Pearl Smith. I made a chemical analysis of it, and found no poison of any sort in it. The stomach was apparently in a healthy condition, containing an undigested meal, or a partially digested meal.

Thomas Johnson was introduced and testified in part as follows: I am a police detective, and have been connected with the police department about six years. As such police officer, I was called upon to execute a warrant of arrest for John Wooley, about the 9th or 10th of February, 1907. Officer Moore assisted me. I received the warrant on Sunday, I believe, and went south of town down near Faucett, Missouri, and arrested John Wooley and his wife. I brought them to central police station in this city, arriving at the police station in the neighborhood of seven or eight o'clock in the evening. It was on Sunday evening. Had them locked up. I next saw John Wooley the next morning, possibly about nine o'clock, at police headquarters in the secret-service department. Mr. Moore and Mr. Kelly and Mr. Ryan and Miss O'Hara and you were present.

"Q. Did John Wooley make any statement there at that time, in the presence of the parties—

"Mr. Schultz: Now, if the court please, we would like to go into that question.

"The Court: Yes, sir; Mr. Sheriff, take the jury to their room.

"The jury retire from the court room.

"Mr. Keller: Did John Wooley make any statement to you in the presence of those other parties? A. Yes, sir; and that statement was reduced to writing. It was read over to him. I think he read it himself.

We just simply talked to him about this child's death and what lead up to it, and he finally came through and told the whole circumstances in connection with the whipping of this child, and everything connected with it. There was not anything done by the officers to force him. Nothing more than simply talk to him. No force or intimidation whatever was used. The statements on his part were voluntary, of his own free will. He talked free. He had not, previously, at any time been put in fear or terror, and no undue advantage taken of him in any way whatever. He was told that he did not have to tell anything, but that it was the best thing for him to tell the truth in connection with it. I was present the following morning, being Tuesday morning, when a statement, which had been made on Monday afternoon by Mrs. Wooley, was read over to John Wooley in the presence of his wife and other officers there at the station, Mr. Moore and Mr. Lookwood.

"Mr. NEVILLE: We want to object to any reference to any statement at any time, purporting to have been made by the wife of this defendant.

"The COURT: The court rules that any statement that Mrs. Wooley made hasn't anything to do with the defendant, unless that statement was submitted to the defendant and he made some acknowledgment of it.

"Mr. NEVILLE: We want to further object that she is the wife of defendant, and the State is attempting to do, in an indirect way, what it is not allowed to do in a direct manner.

"The COURT: The court rules that if this statement was submitted to the defendant, and he heard it and acknowledged it, or anything he said in regard to it, is evidence against him—anything he said. Go ahead. Exception.

"This statement was read over in the presence of John Wooley and his wife. Mr. and Mrs. Wooley,

were both brought into the office and this statement was read to them, and Mr. Wooley said this statement, in regard to the treatment of the child, that one or two of the little things there were not correct, but that most of the statement was correct.

"Mr. KELLER: Tell the court what part of the statement Mr. Wooley said was not true. A. If I remember correctly, she said that he told her to go and milk the cow, and he said that that was not right, that she volunteered to go and milk the cow; and she said that he told her to go by the house, as she went, and see about the baby; and he said that he didn't tell her that. And with these exceptions he said that the statement was true. The signature to this statement is John Wooley's. He signed it in our presence at the same time that we signed that."

Charles H. Kelly testified, and he said: I am chief of detectives of the city of St. Joseph, and as such participated in the arrest and examination or talking to John Wooley and his wife, Anna Wooley. I did not see them until about nine o'clock the night he was brought up—Sunday, February 11th. I brought him upstairs and talked to him and he told me about whipping the child on a Friday, about three weeks before the child died. I did not use any undue means to get him to tell me anything, and did not put him in fear, or anything of that kind. Did not threaten him in any way; did not hold out any hope of reward, or anything of that kind. The next day Miss O'Hara and Mr. Keller and Moore and Johnson and myself were at the office, and then we sent for Mrs. Wooley and talked to her awhile, and then I sent for John Wooley, and talked to him awhile, and then we took Miss O'Hara in Ryan's room and took this statement. That afternoon we brought Mrs. Wooley down, and she made a statement, and the stenographer took it down; and that evening after supper, about seven o'clock, or possibly eight, the prosecuting attorney

brought Wooley's statement down, and we sent for him and he came up and signed it. It was read over to him and he signed it, and the next morning Bart Lockwood brought Mrs. Wooley's statement down, and they were both sent for and brought into my office, and the statements were read over in their presence, and part of it was read to Wooley the second time, and Mrs. Wooley signed it, and John said that it was true with one or two minor exceptions. The exceptions he made to it were: He said that when they were at the spring that she volunteered to go and do the milking, and she had said in her statement that he told her to go and do the milking; and she had said that he had said to be sure to go and see how Pearl was, and he said that he didn't tell her to go and see how Pearl was. The statements were signed there and a couple of the boys signed it as witnesses to her signature.

Thomas Moore, a witness for the State, testified in substance: I am a police officer in the city of St. Joseph in the detective department, and was one of the officers that arrested John Wooley and his wife. On Sunday afternoon we took a rig and drove down to the Wooley home and read the warrant to Mr. and Mrs. Wooley, and put them in the rig and drove back to St. Joseph. We turned them over to the men in charge of the station. I next saw them again the next morning. Mr. Wooley was brought up in the station and we asked him a few questions, and he answered them, and Miss O'Hara was there taking the statement and confession of this crime. Miss O'Hara took the notes away from there with her. The statement was brought back and it was read to Mr. Wooley. He read it and then signed it. I saw him sign it. Mrs. Wooley was brought down, and she made a confession, which was taken by Miss O'Hara in notes. Mr. Lockwood brought her statement down Tuesday morning. I saw Anna Wooley sign it. On Tuesday morning, Mr.

Lockwood came down there with the statements in the form that they are in there now, and we brought Mr. Wooley upstairs and Mrs. Wooley downstairs, and took them into the secret-service office, and read the statement over to Mrs. Wooley, and to Mr. Wooley. They were sitting right close together. Mr. Johnson read the confession, and Mr. Wooley took it himself, and he was asked if it was correct and right, and he said it was, except one or two things. These things were, she claimed that he suggested to her to go and milk, and he said that she suggested that herself. She says the he told her, when she started, to stop and see how the baby was, if the baby was all right, and he says that he didn't say that.

Patrick J. Ryan testified substantially as follows: I was present part of the time when the statement was secured from John Wooley. It was a day or so after he was arrested. Quite a number of questions were asked Wooley, and he answered them pretty fully. Before the statement was taken, Chief Detective Kelly had a little talk with him. My recollection is that Kelly told him that nobody believed the story that he told at the inquest, that it was not reasonable, and that he had better tell the whole truth. That was about all. I cannot say that he told Wooley that it would be better for him to tell the whole truth, but that was the substance. I was present when the statement of Anna Wooley was read to John Wooley. It was in the secret-service room. John Wooley said it was all true with a slight correction, that I think he made in one part of it. I couldn't say what the correction was any more, but it was a slight correction.

B. M. Lockwood testified in the case on the part of the State substantially as follows: I am assistant prosecuting attorney of Buchanan county, and held that position in the month of February this year. I was present when the statement of Mrs. Wooley was

read to John Wooley. I read the statement to John Wooley. He didn't take the paper in his hands and read it, he was asked if it was true—well, I think first she was asked in his presence, and then he was asked if it was true, and he replied that it was; and nodded his head. He nodded his head and said, ·yes, it was true. He said it was true with an exception or two.

"Mr. NEVILLE: We desire to object to any reference to the statement of John Wooley, for the reason that the State has not shown that those statements were secured from the defendant in a free and voluntary manner, on his part; and we desire to object, further, to any reference to Mrs. Wooley's statement, for the reason that the State has not proven that that statement was secured from her freely and voluntarily, and of her own free will, and that they have not shown that there was no inducement held out to her to make that statement.

"Mr. SCHULTZ: I would like to add a further objection, for the reason that the defendant was brought into the presence of the prosecuting attorney, an officer of the county, and behind closed doors with him for a period of probably two or three hours, and that he, in addition to being the prosecuting attorney, an officer of the State to prosecute the defendant, who was at that time under arrest, was a notary public, and that the defendant was made to testify under oath to the statements made by him.

"The COURT: The objection is overruled, and the court holds that whether the confession made by Mrs. Wooley was free and voluntary does not make a particle of difference. The question is whether or not the defendant acknowledged it after it was made. And the court finds from the evidence introduced that the confession was free and voluntary, and admissible to go before the jury.

"Mr. MOTTER: I wanted to make an objection. I didn't know whether it was the intention to intro-

duce the confession of Mrs. Wooley in evidence or not.

"The COURT: Well, the court finds that the confession made by the defendant, and signed by him, was free and voluntary, and admissible to go before the jury. And the court also holds that the confession made and signed by Mrs. Wooley, and it having been read over to the defendant, and he acknowledged it was correct, except in two particulars—that at the time he acknowledged it was correct except in two particulars, was free and voluntary on his part, and that that is admissible to go before the jury. To which ruling of the court defendant at the time excepted and still excepts.

"Mr. MOTTER: I want to say just a word about that, I desire to make this further objection to the introduction of the testimony of Mrs. Wooley: The fact that she is the wife of the defendant on trial, and that she is the codefendant in this case, and no conspiracy has been shown. It is the theory of the law that the husband and wife shall not be placed in opposition to each other in the trial of a criminal cause. In this case, should the wife's testimony be admitted, it is directly against this theory. If she can testify in this case, it is absolutely impossible to impeach her testimony, and is directly contrary to the theory of the law that the husband and wife should not be placed against each other in the trial of a criminal cause.

"The COURT: There isn't any question but what the wife cannot testify against her husband, directly or indirectly, but this is—

"Mr. MOTTER: This is an indirect method.

"The COURT: It is only admissible because the defendant acknowledged that it was correct, when it was read over to him. It is not her testimony; it is his—his admission. Bring in the jury, Mr. Sheriff.

"Mr. MOTTER: We except to the ruling of the court."

The jury returned to the court room. After the jury were returned to the court room Thomas Johnson was again introduced and his testimony is substantially the same as that given by this witness before the court in the absence of the jury.

Over the objection and exception of counsel for the defendant the statements as made by John Wooley and Mrs. Wooley were read in evidence, which were as follows: First, John Wooley's statement was as follows:

"My name is John Wooley. I am twenty-eight years old my next birthday. I live about a mile and a half north and a half east of Faucett, on the McDaniel place. I am married. Have been married since the 12th of October, 1906. My wife had a child, a little girl, when I married her; and the child's name was Pearl Smith. The child would be about twenty months old now. It stayed with its grandmother some of the time. I couldn't say whether the child was with me and my wife during the month of January or not. Four weeks ago last Friday in the afternoon long about sundown, I went to clean a spring on my place, and my wife accompanied me. She stayed about five minutes, I suppose, and then went to the house to go to milk. For a week or so previous I had done the milking. She volunteered to do the milking while I cleaned out the spring. When she left to go to milk, I did not say anything to her about looking at the child. It was something like a half hour after she left the spring before I left and went to the house. The lower part of the house has two rooms, and I had to go into the kitchen first to enter the house. The door leading into the room where the child was was closed. I went in and opened the door and went into the front room, where the child was on the bed asleep. I picked the child up by the arm, slapped it

four times in the face, on the side of the face, then
dropped it on the floor, so that its face and mouth first
hit the floor, leaving a bloody place where it fell.  I
then picked the child up and put it back in bed, and
arranged the covering back on the bed.  I then went
out into the yard, and to the meadow.  I took a spade
with me through the yard and into the meadow, but
I did not meet anybody in the meadow.  My wife was
coming from the milking as I came up to the wood pile,
where I cut some wood.  My wife went into the house,
but came out and hollered to me that there was some-
one in the house.  I told her I guessed she was mis-
taken.  She called for me to come and I went in with
her.  She said she thought the baby was gone; and
she picked her up and she was asleep.  The baby was
not unconscious at that time.  She kind of commenced
whining before its mother picked it up out of bed, and
while it was in its mother's arms the child said,
'Papa.'  I did not hear the child say 'hit.'  My
wife wondered how it happened, and I told her that
I had done it.  And I told her in the morning that I
had done it.  My wife and I had some fusses and quar-
rels about the children, and one evening previous to
this time, I scolded my wife for having whipped my
little girl.  That same evening, I had my wife's little
girl on my lap, and slapped it across the side of the
head; and my wife jumped up and took the child and
said that if I kept on beating the child that she would
take it and leave.  I did not at that time, or at any
other time, while fussing with my wife about her
child, say that if the 'damned brat' didn't mind I
would kill it.  My wife and I first made up this story
that we told at the coroner's inquest Friday or Satur-
day.  I told her it would be better to tell that story,
that it would keep us both out of trouble.  The story
that we told at the coroner's inquest was not true.
My wife at that time did not know who beat the child.
I told her the next morning after I had hit the child

that I did it, but she didn't think so. There was an insurance on the child's life. I don't know how much. Her mother (my wife's mother) kept the insurance. I knew the old Mr. McDaniels, and after the child died I met him and had a talk with him. I don't remember telling him that the child's life was insured for $150. After I left him I went to his son's house. His name is Pasley McDaniels. I asked to borrow some money from him and he said he didn't have any. I told him the child's life was insured, I don't remember telling him how much it was. It was not my intention, while my wife was milking and while I was cleaning out the spring, to go up and whip the child. I don't know why I did it. The bruises on the side of the face of this child were the result of the slaps that I gave it, and it had convulsions and scratched its nose. The marks on the face were caused by me. The marks on its throat were caused by the dress neck, I suppose. I don't know what caused the bruises on its side. I know it was bruised on its side. From its little hip up to within two inches of its arm its side was a solid bruise, except there was a partition between them like finger prints; and that covered the whole of its side up to within two inches of its arm; something like that.

"Q. Who did that beating, John? A. I did (or I didn't).

"I did that Friday evening. I didn't do that beating on the side. I don't know who did that, and I don't know when it was done either. The marks on the side of this child were on there before that night. It looked like she had been hit, but I don't know who hit her. There was no one about my place besides my wife and myself to have hit her. I don't know who did that beating. I know I didn't. Prior to this night that I picked the child up and hit it on the side of the head, I had hit it quite a number of times

and my wife would fuss with me about whipping the child.

"These statements that I have made to-day are voluntary statements on my own part, and I make them freely of my own free will without fear of punishment or hope of reward."

Mr. Keller then read the confession of Anna Wooley, as follows:

"My name is Anna Wooley. I live near Faucett. My husband's name is John Wooley, J. W. John signs it. I am the mother of Pearl Smith. The first trouble we had over her he whipped her severely and I ran in and grabbed her away from him. He whipped her on the head and face and turned up her little clothes and spanked her and I ran in. I don't know exactly whether that was the first whipping he gave her, I don't know exactly. I guess about a couple of weeks, I suppose, before she was hurt severely, and when I ran in and grabbed her I run in and got some cold water and bathed her face and head in it and after that she began to get better. I set her in the high chair, and had my husband's little girl bathe her face in cold water, and he said that if she couldn't be made to mind that he would kill her, and I told him, 'Look here, John, if you whip her that way any more you and I are two, I will take up the baby and leave,' and he said, I and the damn kid both could go; and after he got over his mad spell he said he knew he whipped her too hard, and he was sorry he whipped her, and then in a few days again, one morning, I got up and dressed her and sat her in the rocking chair by the stove, and I went back into the kitchen and she wet on the chair, and it made him mad and he jerked her out of the chair and slapped her a time or two, and said he was not going to have the damned kid ruining everything, and after she got up he grabbed her from me and hit her little head on the floor. I said, 'John, you will kill that baby,' and he said, 'I

don't give a damn if I do.' So I took her up and brought her back in the kitchen, and then there was not any more trouble about her. And then on Wednesday, when she got hurt severely, she fell out of the high chair, before she got hurt severely, and bruised her little head and face, but still she was not bruised so very bad from that, and that was on Wednesday before she was hurt severely. On Friday evening, just a few minutes before four, she came to me and told me she wanted to go to sleep, and I picked her up and rocked her to sleep, and after that I put her on the bed and covered her up with a large heavy overcoat, and he says, 'I believe I will go down and dig out that spring.' He says, 'You come and go with me, and I will show you where the spring is at.' I says, 'Well, I will go, being as the baby is asleep.' We went down to the spring and I stayed down there about ten or fifteen minutes, somewheres along there. He says to me, 'It will take a long time to dig out the spring, and you better milk, and get a bucket of water.' And he says, 'Be sure and go in and see about the baby before you go.' When I went up to the house, I didn't go clear to the bed where she was, she was lying just like I left her and she was asleep. I turned around and went out of the room and shut the middle-room door, and picked up my milk bucket and went on out and went over to milk, well I had to go a quarter of a mile or something like, it's clear outside of home, and after I got there I had to go across the road into a small stock field and get our cow, and just when I got down to the barn, Mrs. Bill Mathers was going from her milking, and she and I stopped there and we talked for about five minutes or something like that, and then after I got my cow I went down below the barn a ways and got some hay and feed for her, and then went back up to the barn and fed her and milked, and then after I got through milking I went up to the house, where Mrs. Bill Mathers

lives, and got a bucket of water, and went on over home, and I could not walk fast because it was so icy. And as I got to the house he was coming up from the direction from towards the spring, and he stopped at the woodpile, and he set his spade down and went to chopping wood. We was hollering backwards and forwards, and I hollered and asked how he got the spring, and he said he had about dug it out. Then I went on in the house, or started in, and I saw the middle door was open, it was getting dark in there, the middle door that I had shut, and I never took time to set my bucket of milk and water on the table, I just set it down on the floor, and ran out and hollered to him, and I said, 'Come here and go with me, there has been somebody in the house.' And I says, 'They have taken little Pearl, or they have killed her, one or the tother.' And he says, 'Oh, I guess not. You are just scared. I guess there has not been anybody in there.' And I told him, 'I knew better. I had shut the middle door, and it was now standing wide open,' and so he came in the house with me, and I lit a match and looked around in the kitchen and went in the front room and lit the lamp, and the baby was lying quiet on the bed, covered up just as I had left her, and he says, 'I guess she is all right,' and started back down again and I went up to the bed, seen her face was all bruised up and that her mouth was bleeding. The coat was up just about as I left it and her little head was drawn back into the pillow; she was apparently asleep. And when he started out, and when I went to the bed and said, 'My God, John, she is not all right, look at her little head and face.' And I dragged the coat up and throwed it back and picked her up and kind of roused her. I suppose I talk to her tolerable loud and says, 'Pearl, are you hurt?' Just that way, and she opened her eyes, and when she opened her eyes and began to look around, John, he was standing close, and she says,

'Papa,' the first think she spoke. After that she roused up and he took her out of my arms and went and sit down in the rocking chair, and wouldn't let me have her any more, I knelt down in front of him right by the baby, and I says, 'Pearl, were you hit?' And she says, 'hit' right after me. And her body was all bruised, and her left side was bruised, both sides were bruised; but one side was bruised worse. And there were finger marks on her little back and side, and there was a ridge right across the small of her back about the size of my two fingers, and there three marks on her little right leg; of course, there were not marks on her stockings, but there were some marks clear down to her little foot, clear down, and her little left eye was bloodshot and swollen, when I found her, and the next morning her little eye was swollen, the eye which was swollen clear inside of her little eye. These were all fresh bruises; yes, sir. In a few days that blood had all settled under her eye, and the scab came off, and her little ear was beaten so it looked as both sides of her little head was beat in nearly, and her eyes were swollen and just looked like it had been chewed, and it had turned just as blue as could be, and her left ear there was a place right behind that broke and run blood, and her arms were bruised in places. And he was the first that suggested to see inside if she had fell off of the bed. And see if she had been hurt inside or whether she had fell off the bed, or somebody had been in, and he still had the baby in his arms, and I went and picked up the lamp and went over by the bed, and he was the first one saw the marks from the foot of the bed up to the head where it looked like little footprints in the feather bed. It was small footprints, but still there was no blood on the foot of the bed where she had mashed it down crawling upon it, and then we went around to the side of the bed, and he said, 'Let us look on the floor and see if there is any signs on

the floor.' There was blood on the floor in the shape of her little mouth, and he was the one to discover it, and then he said, 'I guess there has not been anybody in here, or that would not have done on the floor.' There wasn't anything near the side of the bed where she could hit or bruise herself in any other place. He was the first one to suggest about what to put on her. I went and fixed poultices he told me and I kept poulticing them, and after while she seemed to get easy, and she went to sleep and we took her and went to bed with her, and she fretted some in the night, she would wake up and call for a drink of milk or water, and the next morning when she got up she was worse and she wanted to lay and sleep most of the time, and when she was not lying on the bed she wanted her face covered up all of the time. Then on Sunday morning I told him to prepare and that I would get baby's things ready and we would bring her to St. Joseph, so we could have the doctor and so mamma could take care of her. He said he would rather not bring her up here, he would bring the doctor down there. He said he didn't want to come up to my folks, while the baby was bruised up so bad. I told him I was going to bring her and he could come right along with me. He said, 'No,' I could take the horse and buggy and bring her right on up myself. I told him he would have to come along, because I could not hold the horse and keep the little thing wrapped up and her in that condition. 'Well,' he said, 'being as I was bound, he would come, he would come all right along with it.' On Friday morning, the night the child was bruised, John told me in answer to question from me that he did it, and he told me that he did, and he also said he done it, he didn't tell me why he done it, or what he done it with. And there was also a cut about one-half inch long on her little temple. I brought her up to the doctor on Monday, and I showed the doctor the

bruises on her body, and on her head. He gave me
some medicine to put on her head, but none to put on
her body, and also the evening she was hurt there
was a lump on her little jaw and her left jaw, and
he says her little jaw is broke, or knocked out of
place, and he rubbed or kept pressing it until we heard
it click and went back to its place, and also after that
she just laid and chewed the left side of her mouth.
She had a ridge on the inside of her mouth clear the
whole length of her little jaw. And when I took
her from St. Joe, the Saturday evening after the Mon-
day that I brought her up here, when I took her home
the doctor said she was getting along nicely. My
mother begged me to leave her with her, but she was
sick and I took her home with me. And when I started
mamma said that she would never see little Pearl
alive again, and she looked at John kind of suspicious,
as if she thought he done it. Of course, she didn't
say anything, and I says, 'Mamma, if you accuse John
of it, I will never step my foot inside of your house
again,' and she says to me, her and my step-father
both, 'We don't have the least idea that John done it.'
These are the words she told me. And Monday after
we took her home on Saturday, we called Dr. Hull for
baby and me both, and when the doctor came in he
noticed that there was something wrong with the baby.
She was sitting on the davenport playing, and she had
such a wild look on her face, and she gave such a funny
laugh. He noticed right straight there was something
wrong with her, and so we had him examine her;
he gave us some medicine to give her; it lasted on up
to a day or two before she died. So then on Saturday
night, along in the night, the baby got to crying and
fretting, and it was between us, and I allowed she was
getting too warm, and then I got up to get her quieted
down. John got up and began spanking her and he
spanked her all over from the top of her head. He
grabbed her clothes right in her little breast. He

whipped her pretty severely; he grabbed her and held her up by her clothes, whipping her. It left a large kind of a lump bruised spot on her breast. I had put a piece of flannel on her chest, and I suppose when he grabbed her up, I suppose the safety pin scratched her right there. I jumped up and grabbed her and got between him and the baby so that he couldn't hit her, and I took the lick in place of the baby, and I noticed that she was hit and stiffening out, and I says, 'Oh, my God, John, you have killed her.' He kind of jumped up and pretended that he was asleep, and that he didn't know what he was doing until I hollered at him. I told him it looks funny that you could get up and whip her that way and you sleeping, so he jumped out of bed and grabbed her out of my arms and ran into the kitchen, cold. And all the time she was grasping for breath. We bathed her little face in cold water and rubbed her, and it was not very long until she rallied up out of it, but her little arms were drawn right up and her little legs were drawn back. That was the first convulsion she had, and she went to sleep. Well, she fretted all along in the night, and she seemed like she had a good deal of inward fever. She wanted to drink all the time, and it got so I could not give her any milk, she had so much fever, it curdled the milk, and it come up in a hard chunk, and she throwed up several times, and she would seem to be worse, and she just wanted to lay all the time, she just wanted to lay perfectly flat all the time. She didn't want us to hold her, and then she would have from one to two every day, it would commence along in the evening, but they wouldn't last long, but there was something that would come up in the pit of her stomach, a large lump, and her little stomach would bloat up, and whenever she would go to have these spells there were a lump come up in her little throat, and that continued on until she died.

"Dr. Hull was called in the evening she died. He

was there a couple of hours, I suppose, before she died. Dr. Hull was there. I took the baby home on Saturday and then Dr. Hull wasn't there any more until the evening the baby died, and that was Wednesday, the 6th of February. We had no doctor from the time he whipped the child the last time until a few hours before its death, about two hours before it died. It died at 11:30, and when he came, as quick as he came in, he shook his head at Mrs. R. B. Farris, and as soon as he got his hands warm, he went right up to the baby and began to examine its little stomach, and he kept his hands on its little stomach from the time he came until it died, and every little bit he would lay his head down on her little stomach and breast, and a few minutes before it died, he examined the head, and he said it seemed the left side of its head seemd to be all soft. But he said he couldn't tell exactly what killed it, and when it died, there was blood come out of its little mouth, that was the first blood that had come out of its mouth.

"Mr. KELLER: Where and when did you make up the story, and with whom was the story made up with that you told at the coroner's inquest? A. It was just John and I that made it up. He said that we would both tell about the same thing, about me coming and hollering and about him joshing me about being afraid. He seemed so anxious. He said he knew there would be something done, and they would blame him for it, and he was more so after coroner was down there. He said we would both get into trouble if we didn't tell the same thing, and stick to it, and I told him, if there is any trouble over it, I says, 'Both of us will be put into it just the same as you.' And I says, 'There was not anybody on the place, we both knew of,' and the Saturday night that we buried the baby, that night he fretted all night and worried and turned over, and wanted to know if I was asleep, and he says I know that we was going to get into trouble, and that he

knew that they were coming after him, and Sunday morning coming home, he talked all the way about us getting into trouble, and him especially, and he seemed to be so uneasy all Sunday. The story I told at the coroner's inquest was false, but it was not my fault. It was the Saturday night before she died on Wednesday that he gave it the last whipping. He caught her clothes up on her little breast and drawed it right tight around her neck and shoulders, and held her and gave her two or three hard slaps on the head and face and hit her all over, but just as soon as I could, I jumped up and dragged her away from him, and it was then that the child had the convulsions. She was having it when I grabbed her. She was just as stiff as she could be. I grabbed her from him. And there was a large knot in her stomach and there was a lump coming up and it was choking her.

"I am making this statement voluntarily and of my own free will. I am making the above statements without hope of reward or fear of punishment, and everything I have said is the absolute truth."

Charles H. Kelly, Thomas Moore and B. M. Lockwood were again introduced as witnesses in the presence of the jury. Their testimony is substantially the same as given in the absence of the jury, as heretofore indicated.

This was all the testimony offered in chief on the part of the State. At the close of the State's evidence the record disclosed that the defendant filed a demurrer to the evidence and that this demurrer was overruled by the court, to which action of the court the defendant duly preserved his exceptions.

On the part of the defendant W. H. Robertson testified, and he in part, said: I live at Agency, and am in the undertaking business. I saw John Wooley the day Pearl Smith died, and also the day after she died. I saw him at his home. He came after me the same day the child died. He came there for a coffin

for the child. I never saw Pearl Smith except her face. That was the day after she died. The appearance of the child was all right, that is, the face, except the bruised place, or a scratch on its nose. There was nothing unusual in its appearance. I did not see the temples of the child, I made no examination of the child.

James S. Willis, another witness for the defendant, said in his testimony: I reside at Agency Ford, and I am with the undertaker there. I was at the house of John Wooley after the death of Pearl Smith. I took her coffin there, and saw the body of Pearl Smith; it was lying in the house on a chair. I removed the cloth from the face of the corpse, and I noticed on its nose a bruised spot. It was something like a scratch. I did not notice anything unusual in the appearance of the child.

Ollie Farris, who testified on the part of the defendant, said: I live about two miles east of Faucett, and was on the coroner's jury in this case. I know John Wooley.

"Q. Did you ever have any conversation with him before this child's death, concerning its condition?

"Objection, sustained. Exception.

"Mr. MOTTER: We propose to show by this witness that the defendant told him sometime before that he had a very sick child."

I was present at the coroner's inquest. To the best of my knowledge, I remember Dr. Hull saying, at the inquest, that it was hard to tell just what caused the child's death. As a juror, I partially viewed the body of Pearl Smith. The remaining six jurors were with me. Mrs. Dively was there. She attempted to explain to the coroner's jury, as we were viewing the body of the child, that the coloring or dark places on the cheek of the child was caused by the child falling from a high chair, as I remember. As to the appear-

ance of the body of the child, I could only see its face and hands. We didn't take any of the garments off of the child. There was a dark place on the right cheek, as I remember right, about the size of a silver dollar. There was seemingly a scratched place where the skin had been scratched between the left eye and nose, probably the width of my finger-nail, and probably as long again as my finger-nail. There was a dark streak under the child's throat or chin. In other respects the child's color looked very natural, for a corpse. Mrs. Dively told us that the streak on the neck was caused by a rag which was tied around the child's face after it was dead.

Mr. Holland, who was assistant prosecuting attorney at the time of the holding of the inquest, testified as follows: I am an attorney, and am connected with the firm of Culver & Phillip. I live in Buchanan county. I was assistant prosecuting attorney at the time of the death of Pearl Smith, and was present assisting in the holding of the inquest. I viewed the body of Pearl Smith, just before the inquest was held. I noticed that the child was a frail-looking child, I would say small for its age, and there were some blue spots on it. There was one on the forehead, and, as I remember it, the mouth was bruised a little, and the hands and wrists were blue. That is all I remember of seeing, I can't say that there was anything unusual in the appearance of the child.

W. B. Bass testified for the defendant and said: I live in the south part of the county, and am a farmer. I saw the body of Pearl Smith when she was buried at the cemetery there on my place. The body was in fair condition. The body was in a coffin. They removed the lid from the coffin to take some clothing or something they had around the corpse. To the best of my knowledge there were two bruises or two spots on that body; one of them was in front of the ear and one, possibly, on the nose.

Following this testimony there was introduced some eleven or twelve witnesses, who were acquainted with the defendant, John Wooley, all of whom testified that his reputation was good.

Dr. Luther A. Todd was introduced on the part of the defendant. He testified in part as follows: I am a physician and surgeon, and am a graduate of the college of Physicians and Surgeons, of New York City. Have been practicing a little over seven years. After presenting to the witness a hypothetical question, the following occurred in this examination:

"Mr. SHULTZ: Well, let me ask you this question, doctor: Would you say, in view of the facts stated, that the child had died from shock? A. Do you say that the child had convulsions before death?

"Q. Yes. A. Several days before death?

"Q. The evidence shows that at the time of death it had convulsions, and the evidence shows that it had convulsions for five days; some evidence that it extended for a period of four or five days? A. And did you say that the bruises were on the body twenty-one days before the injuries alleged?

"Q. Yes. A. Well, I should not say, then, that the baby died of shock. In view of the fact that only one cavity or two cavities of the body were opened at the autopsy, the head and an incomplete examination of the heart and lungs, I could not determine whether there might not have been some cause of death in the abdominal cavity—in the intestines, or kidneys, or spleen. Of course, the stomach was looked at, not under a microscope, but the contents of the stomach were examined. I couldn't decide the cause of death, in a case like that, without a complete pathological report—a complete autopsy."

Dr. J. F. Owens testified in part as follows: I am a physician and surgeon and have been practicing about fifteen years here in St. Joseph, and in the

vicinity surrounding.  Counsel asks hypothetical question.

"A.  This autopsy, I believe, was held six days after the death of the child?

"Q.  Between six and seven days, and these findings were what they found existing at that time?  A. I don't think I could state that these injuries would be the cause of death.  They were surface injuries, it seems, according to the statements."

Mrs. Mollie Lynch made the following statement before the jury as a witness: I live at Agency, Missouri, and have lived there all my life.  I went to the home of John Wooley shortly after the death of Pearl Smith.  They telephoned for me.  Mr. R. B. Farris telephoned.  I went there on Thursday morning about 11 o'clock, after the baby died Wednesday night.  I saw the body.  It just had a blue spot on one side of its cheek, about the size of a quarter, and a small scratch on the side of its nose, that they said it had done when it had those spasms.

Georgie Wooley testified as witness for the defendant, and said: I am seven years old, and go to school and Sunday school.  [Here witness is examined as to her understanding of the nature of an oath.] I remember going down in the country, with my father. I am a daughter of John Wooley.  It was about one day after Christmas.  I was staying at Grandma Honecutt's.  My papa came there, and my step-mama, and little Pearl came with him.  They came in a buggy. They came in the morning.  Little Pearl and I played in the front room; she sat in papa's lap, and I played with her.  We went away in the buggy, down to my papa's house at Faucett.  We stayed down there about three weeks.  When I was at my papa's house on the McDaniel place, I saw little Pearl get hurt; she fell out of a high chair.  She had her foot on one arm, and she had a foot under the chair.  She fell right down face first, and struck on her face.  It made a

bruise on the right side of her head. I never saw Pearl get hurt at any other time. Yes, I saw my mamma strike little Pearl over the back of the head with a switch.

The defendant, John Wooley, was then introduced in his own behalf, and testified substantially as follows: My name is John Wooley. I am the defendant in this case. Am twenty-eight years old the 15th of last May, and was born in the southern part of this county, near Wallace. I was married the first time in '99 or '98. My first wife is dead. I have one child, the girl that was on the stand this morning, by my first wife. I married the second time the 12th day of October, 1906. The woman I married was a widow woman, and her name was Smith. She is the woman who is indicted jointly with me. I suppose we kept house in St. Joseph a couple or three weeks, then moved to Wallace. We stayed there six weeks and then moved to McDaniel's farm, and was living there at the time I was arrested. I was breaking ground and made a few posts while I was living on the McDaniel farm. My second wife had a little girl by her former husband. She was Pearl Smith. She was twenty months old at the time of her death. We didn't take her to the country at the time we moved down there, we came up after her and got her somewheres about the 27th or 28th of December. My wife and I went after her. We took both of the children down home. My little girl stayed three or four weeks, and then I took her down to my father's at Wallace, to go to school. One day when I was out breaking ground, and came in, and the child was hurt, and my wife said it had fallen out of the high chair. I never saw the child until I came in from work. And then it got hurt again on Friday, it fell off the bed, or some how it got hurt.

"Mr. Shultz: Tell the circumstances of that? A. Well, I got a spade and went to the spring to dig

out the spring, and when I went around the house
my wife asked me where I was going, and I told her
I was going to dig out the spring, and she says, 'Wait
a minute, and I will go with you to dig out the spring;
I want to know where it is at;' and I waited two or
three minutes, and she went down with me, and while
I was down there' digging out the spring, I says, 'This
is going to be an awful job getting this spring dug
out, for there is a big square box in the spring, and
it has been in there for some time.' She stayed down
there a little while, something like five or ten minutes,
and went to the house to go to milk, and I kept on
working at the spring, until I got it dug out, and
when I came up to the house she came from milking,
and I set the spade down by the fence, on the east
side of the gate, by the wood pile, and went to cutting
wood, and she went around the house and went in the
house, and pretty soon she came back out and called
me and said that there was someone, in the house, and
I says, 'I guess you are mistaken,' and she says, 'No,
I aint.' Well, she came out there and called me, and
I went to the house and opened the kitchen door and
went in and lit a lamp; it was getting dark in the front
room, and I lit a lamp. I lit a match and lit the lamp,
and the child was lying on the bed, and she says,
'Well, I guess there is nobody in the house, and it is
all right;' and I went out to cutting wood again. And
in a little while after that she came and called me,
and I went in, and she had the child up in her arms,
and when I went in the child put its hands to me, and
says, 'Papa,' and I took it and went and sat in the
rocking chair. And there was a place on its mouth
where its teeth had hurt it and the place where it
fell out of the high chair, and we put a milk poultice
on it, the same as we had when it fell out of the high
chair, and I sat there a little while and rocked it to
sleep, and I put it back on the bed, and it went to
sleep, and my wife and I went and had supper. That

is as far as I know. . . . Johnson and Moore arrested us and took us to town, and we got here between seven o'clock and half past seven. He took me down and locked me up in a cell and took my wife up stairs, and I stayed in there awhile in the cell, and they came and got me and took me up stairs into Kelly's office. Then Mr. Kelly commenced to question me. He wanted me to tell him how this happened, and I started to tell him, and he says, 'There ain't any jury on earth would believe that about this child falling off of this chair and this bed and getting hurt;' and I says, 'Well, that is just the way it is;' and he says, 'Now you come through and tell the truth about this;' and I says, 'I am telling the truth;' and he says, 'No, you are not.' And then he commenced begging me to tell him more, and I wouldn't tell him anything, then, and he was sitting off a piece from me, and he pulled his chair up in front of me, and he says, 'I have known you a good while, and you always seemed like a pretty good fellow, and you come through and tell this,' he says, 'I have got a pull with the prosecuting attorney, and I do business with him, and if you come through and tell me this, I will help to get you out of this;' and still I wouldn't tell him anything about it, and he got up and walked around the floor, and he says, 'Ain't you going to tell me?' and I says, 'I started to tell you, and you said I was lying about it;' and he says, 'Now, John, have you ever whipped this child?' I says, 'Yes, I have corrected her three or four times— spanked her;' and he says, 'Whereabouts?' and I says, 'On the body;' and he wanted to know if I left any prints or bruises, and I told him it did not, that I thought too much of the child to whip it that hard; and he begged me, I guess he was there two hours and a half, or maybe longer, trying to get me to come right out and say that I beat this child up, and I wouldn't tell him, but I told him I had whipped it three or four times; so they took me back down stairs

and locked me up in the same cell where I was at, and I stayed in there just a few minutes, and he came down, and he says, 'John, maybe you would rather go around in the other side, in the other cell; there is some cots in there, and you can rest better.' But before this, when he had me up-stairs, he says: 'You come through and tell me about this, and you can sleep better; you are worried;' and I wouldn't tell him, only that I had whipped it three or four times; and then when I was down in the cell and he came and took me to the cell where the cot was, and put me in there, and left me there that night; and so the next morning the prosecuting attorney came down, and they took me up-stairs again, and they tried to get me tell, and I wouldn't tell them nothing then, and Kelly wanted me to tell the prosecuting attorney what I told him that night, and I didn't tell him that for a little bit, and they got a bunch of them around in there, and commenced questioning me, and talking. That is about all I know about that. I know I was rattled and I was scared when they had me up there.

"Q. Now, tell the jury what condition you were in physically at that time, and the reason for it, if you know? A. Well, I had lost lots of sleep; my wife had been sick, and the child had been sick, and I had all of the waiting on them, and sitting up night and day both, to do, and I was run down, and had lost sleep, and the excitement over the coroner coming down there, and the way everything was, and being arrested, I was all excited up, and all shocked to pieces.

"Q. Tell the jury whether or not, while you were at work at that spring, you left there and went to the house, and went into the house, into the room where Pearl Smith was lying on the bed asleep, and whether or not you picked her up by one arm and held her up at arm's length and slapped her with other hand four times; and then you let her fall on the floor, and that you picked her up and laid her on the bed, and

covered her up, and went out, and went back to the
spring? A. No, sir, I did not; I was not at the house,
after I went to the spring, until I went to the house
when my wife came from milking.

"Q. Tell the jury whether you ever struck the
child and produced any of the injuries she had on her
body? A. No, sir, I did not; as to what occurred in
reference to the statement of my wife, why, that man
over there, I think it was, he came down to the police
station, and they took me up stairs and read her
statement over to me, and asked me if it was true,
and I says, 'Part of it is, and part of it ain't,' and
some party that was in the room asked me if there
was any of it true, and I says, 'Yes, there is some of
it is, and some of it is not;' and Tom Moore was sitting
behind me, and he slapped his feet down behind me,
on the floor, and says, 'Measure him up,' and Tom
says, 'You are not going to measure him up now, are
you?' and he commenced to laughing and grinning,
and I stood over there, and they took my height. I
didn't say to Bart Lockwood or to Tom Moore or to
Charles Kelly or to any one there at the time when
the statement was read over to me, that it was all
true with the exception of two places, and pointed
them out, I didn't point any certain part out in it. And
after they asked me this question the second time, and
I says, 'Some of it is and some of it ain't;' then they
measured me up and took me down in a cell; and then
they says, 'Get ready and get your coat;' and I got
my coat and they brought us to jail."

This sufficiently indicates the nature and character
of the testimony developed at the trial.

At the close of the evidence the court instructed,
the jury on murder in the first degree, reasonable
doubt, good character, credibility of witnesses and such
other general instructions as were applicable to the
testimony in the cause. It is not essential that the
instructions given should be reproduced here, but such

of them, the correctness of which are challenged, will be given attention during the course of the opinion.

The cause was submitted to the jury and they returned a verdict finding the defendant guilty as charged and assessed his punishment at imprisonment in the penitentiary during his natural life. Timely motions for new trial and in arrest of judgment were filed and by the court overruled. Sentence and judgment followed in accordance with the verdict returned, and from this judgment the defendant prosecutes this appeal, and the record is now before us for review.

## OPINION.

It is insisted that the defendant was convicted of the offense with which he was charged in the indictment upon the extra-judicial confession of the defendant alone, and that under the well-settled law of this State no person can be convicted of a crime upon his extra-judicial confession alone, but that it is essential in order to warrant a conviction that there must be proof of the *corpus delicti* by evidence independent of the extra-judicial confession or admission.

It is sufficient to say upon this proposition that upon the facts as disclosed by the record there is absolutely no merit in this contention. That Pearl Smith, the deceased, died, there is no dispute; that she died from the infliction of injuries by violence to her person, the testimony of a number of reputable physicians, as well as other witnesses, strongly tends to prove.

It was ruled in State v. Coats, 174 Mo. l. c. 417, that it was not required, to warrant a conviction, that the body of the crime must be absolutely proven independent of the confession. In commenting upon the cases cited by counsel in that case, it was said: "Those cases approvingly speak of corroborating circumstances. While the confession alone, without any corroborating circumstances or proof *aliunde* as to the

*corpus delicti,* would not be sufficient, yet, if with the extra-judicial confession, such other facts and circumstances are introduced in evidence fully corroborating the confession of the defendant as to that particular subject, it is ample upon which to base a conviction.''

In State v. Lamb, 28 Mo. 218, Judge Scott, in treating of this proposition in that case, says: ''We consider the true rule, as deduced from the current of authorities, to be that an extra-judicial confession, with extrinsic circumstantial evidence satisfying the minds of the jury beyond a reasonable doubt that the crime has been committed, will warrant a conviction.''

In the case last cited it will be observed that the rule was announced that the triers of the fact, in reaching a conclusion as to actual commission of the offense, might take into consideration the confession as well as the extrinsic circumstances corroborating it.

In the case at bar that the evidence warranted the submission of the cause to the jury, is too plain for discussion. The serious injuries of which this little child was suffering before its death, were clearly shown by numerous witnesses introduced on the part of the State, and that her death resulted from such injuries was fully established by the testimony of numerous reputable physicians who had an occasion to make an examination of such injuries.

## II.

It is earnestly urged by appellant that the court committed error in its action by refusing to accept as qualified jurors, eleven of the panel, for the reason that such jurors stated on their *voir dire* that they had conscientious scruples against returning a verdict of guilty in a case where the penalty might be death. Upon this proposition our attention is directed to the amendment to section 1817, chapter 15, article 2, Revised Statutes 1899, so as to permit the jury to fix the punishment for murder in the first degree at

death or imprisonment in the penitentiary for life. It is in insisted that this amendment should have the effect of modifying the qualifications of jurors in cases where the charge is murder of the first degree. We are unable to give our assent to this insistence. The death penalty for that offense is still embraced in the provisions of the statute. The amendment only went to the extent of making it optional with the jury when they found a defendant guilty of murder of the first degree to either inflict the death penalty or life imprisonment. The court would not be warranted in accepting as jurors persons who emphatically stated that they would not return a verdict of guilty were the death penalty to follow, for in that case if the jurors were accepted it would be practically trying the case before a jury who in advance stated to the court that they would be unwilling to return a verdict except for imprisonment in the penitentiary, regardless of the fact as to whether the testimony would justify the infliction of the highest penalty known to the law, that of death.

In our opinion jurors should possess such qualifications as would enable them to fully conform to the provisions of the statute, and if the testimony developed upon the trial should show a case of such an aggravated character as demanded the infliction of the highest punishment they would do so. It was clearly the province of the court, by an appropriate examination, to test the qualifications of jurors, and if any of them entertained such opinions as would preclude them from finding the defendant guilty and inflicting such punishment as the nature and character of the testimony fully warranted, such jurors should be rejected.

There were other jurors to which a general objection was made; in other words, a general challenge for cause was interposed to four of the jurors, without

stating the specific ground thereof. It has been repeatedly ruled by this court that a general challenge for cause as to the qualifications of jurors without stating the ground thereof, is not sufficient to preserve the question for review in this court. [State v. Myers, 198 Mo. 248; State v. Taylor, 134 Mo. l. c. 142; State v. McGinnis, 158 Mo. l. c. 118; State v. Miles, 199 Mo. l. c. 545.]

Appellant still urges objections to other members of the panel of jurors upon the ground that they had informed or expressed an opinion as to the guilt or innocence of the defendant, based upon newspaper reports and published extracts of confession made by the defendant and his wife. We have directed our attention to the disclosures of the record as to the qualifications of these jurors, and while it is true that they had formed or expressed an opinion as to the guilt or innocence of the defendant, such opinions were predicated upon newspaper reports, and published extracts of the confessions of the defendant and his wife. But each of the jurors frankly stated that such opinions would not prejudice him in the trial of the cause or prevent him from giving the defendant a fair and impartial trial, or from rendering a fair and impartial verdict on the evidence developed upon the trial under the instructions of the court. This question has very recently been in judgment before this court in numerous cases in which the charge was murder of the first degree. The most recent case is that of State v. Bobbitt, this volume, page 10, wherein it was expressly ruled, upon an examination of the jurors substantially the same as is disclosed in the case at bar, that the jurors were not disqualified. In this case the authorities were reviewed and cited. To the same effect is State v. Gartrell, 171 Mo. 489; State v. Darling, 199 Mo. 168; State v. Forsha, 190 Mo. 296; State v. McCarver, 194 Mo. 717. Applying the well-settled rules as announced in the cases above indicated, it must be

held that the jurors challenged upon this ground were qualified under the laws of this State to sit as jurors.

### III.

Counsel for appellant complains that the court committed error in overruling the motion to quash the indictment. This motion embraced three separate and distinct grounds: First, that the names of material witnesses who testified before the grand jury were not indorsed on the indictment; second, that witnesses were examined before the grand jury who were incompetent and disqualified to testify, and on whose testimony the indictment was found; third, that the defendant and his wife were called and sworn as witnesses.

At the very inception of the consideration of this proposition we find that the record fails to disclose that the motion to quash the indictment and the grounds embraced therein, as well as the action of the court in the disposition of such motion, together with proper objections and exceptions to such action, were preserved in the bill of exceptions. While in the record proper this motion to quash does appear, as well as the action of the court upon it, together with the objections and exceptions by appellant to such action, yet this is insufficient to preserve the ruling of the court upon such motion for review by this court.

A motion to quash an information or indictment does not constitute a part of the record proper. Hence in order to properly preserve such motion and the action of the court upon it for review in this court it must be embodied in the bill of exceptions, and the overruling of such motion must be properly excepted to and preserved in the bill of exceptions. This is vitally essential in order to raise the question of the sufficiency of the information or indictment, unless such information or indictment is so defective that it fails to charge any offense whatever. This rule of practice

was clearly announced and adhered to in State v. Tooker, 188 Mo. 438; State v. Finley, 193 Mo. 202; State v. Coleman, 199 Mo. 112.

We have carefully analyzed the allegations of the indictment and find that it is in form substantially in accord with precedents heretofore approved by this court. [State v. Stacy, 103 Mo. 11; Kelley's Crim. Law & Prac., p. 309.]

The motion to quash with the grounds of such motion embraced therein, not having been preserved for review, and the charge in the indictment being in proper form, it must be held that the charge is a valid one and sufficient to warrant the court in putting the defendant upon trial thereunder.

## IV.

The motion for new trial complains that the court erred in giving instructions numbered one to twelve inclusive. This is a general objection to the instructions and covers all those given in the case.

We did not deem it essential to burden the statement of this cause with a reproduction of all the instructions given, but our failure to do so does not mean that we have not carefully considered and read in detail all of the instructions given in the case as well as those refused. It is fundamental that where the instructions given by the court fully cover every phase of the case to which the testimony is applicable it cannot be urged as error that the court refused instructions asked by the defendant, even though it be conceded that the instructions requested were correct declarations of law. [State v. Atchley, 186 Mo. 174; State v. Crittenden, 191 Mo. 17; State v. Guinn, 174 Mo. 680.]

It is earnestly insisted by learned counsel for appellant that the court committed error in confining the issues presented to the jury to only one grade of the crime, that is, as to whether the defendant was

guilty or not guilty of the offense of murder of the first degree. It is sufficient to say upon this contention that we have read in detail all of the evidence as disclosed by the record, and after a most careful consideration of it we are unwilling to say that the court committed error in its failure to embrace in its instructions to the jury other degrees of homicide less than that charged in the indictment. It must not be overlooked that the victim of this homicide was a child less than two years old. It was absolutely incapable of doing any act which could be made the basis of a provocation sufficient to reduce the killing from murder in the first to murder in the second or manslaughter in the fourth degree. If the defendant inflicted the injuries from which his step-daughter, Pearl Smith, died, and in the manner which the testimony of the State strongly tends to establish, then, in our opinion, the court properly confined the issue presented to the jury to murder of the first degree. The defendant's victim, his step-daughter, Pearl Smith, as heretofore stated, had not reached the age of two years, and we take it that, in inflicting the injuries as disclosed by the record in this cause upon a child of such tender years, the consequences, that of death, resulting from such injuries, were not unreasonable, and that the defendant should be held to a strict accountability for the reasonable consequences of his acts. As was said in 1 East, P. C., 234, "Where the punishment inflicted for a slight transgression of any sort is outrageous in its nature, either in the manner or the continuance of it, and beyond all proportion to the offense, it is rather to be considered as the effect of a brutal and diabolical malignity than of human frailty; it is one of the true symptoms of what the law denominates malice; and therefore the crime will amount to murder, notwithstanding such provocation. Lord HOLT, in Keate's case (Comb. 406), says that

barbarity will often make malice." [See also 2 Bishop's New Crim. Law, sec. 703, and cases cited.]

Mr. Wharton in his work upon Homicide, says: "Violent acts of resentment, bearing no proportion to the provocation or insult, particularly where there is a decided preponderance of strength on the part of the party killing, are barbarous, proceeding rather from brutal malignity than human frailty; and barbarity will often imply malice." [Law of Homicide, sec. 425, and cases cited.]

Blackstone, in 4th volume of his Commentaries, 199, treats of this question in the following language: "Also, if even upon a sudden provocation one beats another in a cruel and unusual manner, so that he dies, though he did not intend his death, yet he is guilty of murder by express malice; that is, by an express evil design, the genuine sense of *malitia*. As, when . . . a school master stamped on his scholar's belly, so that the sufferer died, this was justly held to be murder, because the correction being excessive, and such as could not proceed but from a bad heart, it was equivalent to a deliberate act of slaughter."

In State v. Kloss, 117 Mo. 591, the victim of the assault and murder was Patrick H. Thompson. It will be observed in that case that there was no deadly weapon used in the perpetration of the crime, but the facts disclosed that a young man, without a sufficient provocation, brutally beat and kicked his victim to death. The facts as developed at the trial in that case are all fully detailed in the opinion, and it was disclosed by the record that at the very inception of the trouble the defendant propounded to Thompson, who was about eighty years old, impertinent and insulting questions, and in responding to those questions Thompson said to him, "None of your (d—n) business," and shoved him and raised his hand as if to strike him. Upon this state of facts, as disclosed by the record, it was contended that the court should have instructed

the jury upon manslaughter in the fourth degree.
The defendant was convicted of murder in the
second degree, and sought a reversal of the judgment
because the court had not fully declared the law. Not-
withstanding in the commission of this crime there was
no deadly weapon or weapon of any kind used, other
than the fists and feet of the defendant in the perpetra-
tion of the crime, this court, speaking through Judge
SHERWOOD, in no doubtful terms, but in vigorous and
emphatic language, by reason of the atrociously malig-
nant and barbarous acts in the commission of the of-
fense, expressly ruled that there was no manslaughter
in the case, and that the defendant should have been
put upon his trial upon the issue only for murder
of the first degree.   After reviewing the authorities,
as herein indicated, the learned judge, in treating of
that case, said: "Under these authorities and in the
circumstances already stated, even if it be true that
the old man replied to defendant's impertinent and
insulting questions, 'None of your d—n business,' and
shoved him and raised his hand as if to strike him,
the subsequent atrociously malignant and barbarous
conduct towards him, an aged and helpless cripple,
establishes such a case as would have well warranted
an inquiry by the petit jury, as to whether the de-
fendant was not guilty of murder in the first degree,
and it does not admit of doubt that their inquiry should
have been confined to that degree.   Of course there
could be no manslaughter in either degree in the cir-
cumstances of this case, and that inquiry should not
have been submitted to the jury."

Applying these authorities, we see no escape from
the conclusion that the action of the court in confining
the issue submitted to the jury in the trial of this
cause to that of murder of the first degree was clearly
proper.  In our opinion, the defendant was either guilty
of murder in the first degree in this case, or was not
guilty of any offense.  If the evidence as introduced

on the part of the State, which embraced the confession of the defendant and the admission of the truth of the statements made by his wife, was true, and was relied upon by the jury, then the conclusions as reached are fully and amply supported. On the other hand, if the testimony of the defendant at the trial of the cause is true, and the confessions were false and improperly procured, then and in that event the defendant should have been acquitted. The ruling upon this proposition must be adverse to the appellant.

It is also insisted that the court committed error in failing to instruct the jury upon all the law applicable to the case. At the very threshhold of this contention is it well to keep in mind the disclosures of the record. The record before us shows that when the defendant interposed the objection to the action of the court in not instructing the jury on all questions of law arising in the case the court thereupon made the following statement: "The court states to the defendant's attorneys in open court that if there is any special point that is left out, if they will call his attention to it, the court will give it, and if not, the court thinks the instructions cover all the law in the case." Following this statement by the court the defendant, through his counsel, requested an instruction upon the subject of reasonable doubt and circumstantial evidence, which instruction was by the court refused. Upon this proposition we are simply confronted with the question as to whether or not the refusal of this instruction constitutes reversible error. The record discloses that the instruction requested by the defendant embraced both subjects, that of reasonable doubt and circumstantial evidence. An examination of the record discloses that the court had given an instruction covering the subject of reasonable doubt, and the form, as well as the substance of that instruction, has repeatedly met the approval of this court. While

it is true that an instruction upon the subject of reasonable doubt in the form requested by appellant in this cause was given in State v. Talbott, 73 Mo. 347, yet it by no means follows that where the court has covered the subject of reasonable doubt by an appropriate instruction, it is essential to again cover the same subject simply because that instruction had been given in some other case; hence it must be ruled that there was no error in the refusal of the court to further treat of the subject of reasonable doubt, having previously embraced that subject in its instructions to the jury.

Directing our attention to that portion of the instruction which embraced the subject of circumstantial evidence, it is sufficient to say that the recent case of State v. Bobbitt, 215 Mo. 10, fully answers that complaint. While that case fully recognized the correct rule that where the testimony upon which a conviction rests consists of circumstantial evidence alone, it would be error to refuse an instruction upon that subject, but where the facts developed upon the trial clearly indicate that the testimony relied upon for a conviction does not consist of circumstantial evidence alone, then it is expressly held that it is not error to refuse an instruction upon the subject of circumstantial evidence. It was pointed out in that case that the evidence relied upon by the State fell far short of being circumstantial evidence only, but that many of the essential facts which were necessary to constitute the offense were shown by positive testimony. So it may be said in the case at bar. The death of the child; the nature and character of the injuries inflicted and the confessions and admission on the part of the defendant were shown by direct evidence, and the action of the court in declining to instruct upon the subject of circumstantial evidence was entirely proper.

## V.

This brings us to the consideration of the earnest insistence by learned counsel for appellant that the court committed error in the admission of the confession of the defendant after the alleged commission of the crime charged. The contention of counsel seems to be predicated principally upon the ground that the statements made by the defendant and introduced in evidence against him were not free and voluntary.

This question is not a new one in this court. It has repeatedly been in judgment before us and has received at our hands very careful consideration. It is always an important question, for it must be conceded that statements made by a defendant, which are obtained by improper inducements, such as the flattery of hope, promise of immunity, or reward, or by the use of any violence or threats, should never be admitted in the trial of a criminal cause.

We have carefully examined the record applicable to this question. The record discloses that the court proceeded with great care and caution to make the usual preliminary examination as to the admissibility of the confessions made by the defendant. The jury was ordered to retire from the court room in charge of the sheriff, and the preliminary examination as to the competency of the confession was carefully considered. Witnesses were introduced as to the circumstances surrounding the defendant at the time he made the statements; what occurred between the defendant and the officers in charge of him at the time, and after hearing such testimony the court ruled that the confession was competent. The jury was then returned into court and during the progress of the trial a similar investigation to that made by the court as to the admissibility of the defendant's confession was made before the jury. The admissibility of this confession was again submitted to the jury by instruc-

tion numbered 12, in which they were told that "before any confession can be received as evidence in a criminal case, it must be shown that it was voluntarily and freely made by the defendant; and if the confessions given in evidence in this case, and claimed to have been made by the defendant, were procured from him by the use of the flattery of hope, or by any promise or inducement held out to the defendant, or by threats, or through fear, then such confessions were involuntary, and the jury should reject such confessions and not consider them as evidence in this case."

We have then in the case at bar a consideration of this question by the court in the absence of the jury, and a reconsideration of it in the presence of the jury, and a submission of the question to them by an instruction as indicated herein.

Recognizing the importance of this question, we have also reviewed the testimony upon which the trial court predicated its conclusion as to the admissibility of this confession, and it is sufficient to say upon that proposition that the testimony heard upon the preliminary examination, as well as that heard before the jury, fully justified the court in its conclusion that this confession was admissible. It is true that the defendant was in charge of officers and that questions were propounded to him; this, however, was not unusual. It is simply in accord with the past record of confessions made by persons charged with crime. They are usually made while in the charge of officers, and very frequently while confined in jail, but this in no way affects the admissibility of such confessions in the absence of any inducement, threats or promise of reward, or the hope thereof made by the officers in charge of such persons. [State v. Barrington, 198 Mo. 23; State v. Stebbins, 188 Mo. 387; State v. Church, 199 Mo. 605; State v. Ruck, 194 Mo. 416.]

It is also urged that the court committed error in the admission of the statements of the wife of the de-

fendant in evidence, which were expressly admitted to be true by the defendant, with the exception of one or two matters, which could not have influenced the verdict in this case. At the very threshold of the consideration of this proposition it must be conceded that under the law the wife is not a competent witness against her husband in a criminal case, and had she been introduced as a witness to testify against her husband, her testimony would have been clearly inadmissible. In this case the wife was not introduced as a witness. She made a written statement concerning the death of Pearl Smith and the cause of her death. This written statement was made in the presence of officers and the defendant, and after the statement was made and read, the defendant simply stated that the statement as made by his wife was true, with the exception as heretofore noted. The fact that this statement was in writing did not add any force to it, nor in any way change the law as applicable to the question as to its admissibility. It would have the same force and effect if she had orally stated the things that were embraced in the written statement and the defendant had expressly admitted that such oral statement was true. This statement was not testified to by the wife, nor was it made when the defendant and his wife were alone. It was made in the presence of others. In our opinion this statement was properly admitted in evidence, and this conclusion is based upon the admission of the defendant in the presence of witnesses that the statement as made was true. This statement made by the wife places it in no different position than if made by an entire stranger, except that the stranger could testify as to the admissions of the defendant, just as the strangers who were present at the time he admitted that this statement was true as read, testified to such admission. If an entire stranger had made this statement in the presence of the defendant and he had remained silent, under the conditions that then sur-

rounded him, being in charge of officers, it would not have been admissible. If he had remained silent when his wife made this statement, or when it was read in his presence, it would not have been admissible.

The crucial fact which gives this admission force and effect as against the defendant is not the mere fact of the statement of the things made by the wife, but it is the fact that the defendant expressly admitted that the statements as made or read were true. This is unlike the cases of State v. Burlingame, 146 Mo. 207; State v. Richardson, 194 Mo. 326, and Bank of St. Louis v. Nichols, 43 Mo. App. 385, where it was held that the presumption of acquiescence in the statement made in his presence did not obtain from mere silence when such statements were made.

When this statement was made and read in the presence of the defendant and in the presence of others, together with his wife, and he expressly admitted that such statements were true, that in effect amounted to an adoption of the statement as his own, and it falls within the uniform recognized general rules as to the admissibility of declarations against interest, and it was immaterial whether the statement was made by the wife or a stranger.

In Long v. Martin, 152 Mo. 668, this court held, speaking through VALLIANT, J., that "confidential communications between husband and wife are such as pass between them when they are alone," and in discussing that case, in commenting upon the rulings of this court upon that question, it was said: "It was at one time held to be the law of this State that a husband or wife was incompetent to testify to establish his or her agency in such case (Williams v. Williams, 67 Mo. 661; Wheeler & Wilson Mfg. Co. v. Tinsley, 75 Mo. 458); but the more recent consideration of that subject has led to the opposite conclusion."

In Reed v. Reed, 101 Mo. App. 176, it was ruled that declarations of husband or wife in the presence

of a third party participating in the interview, eliminates the confidential nature of the communications, and renders them admissible in evidence. In that case it was sought to introduce admissions by the wife made in the presence of a third party, and the trial court excluded the testimony, and in treating of that question the Court of Appeals, speaking through Judge BARCLAY, thus stated the rule: ''That testimony was ruled out on the theory that it should come from the third party, and that the plaintiff was not competent to testify to such admissions, presumably under section 4656, Revised Statutes 1899. The seal of silence which the law sets upon confidential communication between husband and wife does not rest upon declarations between them which are shared by a third person. To such declarations the rule of exclusion does not apply for the reason that the presence of a third party participating in the interview eliminates the confidential nature of the communications then interchanged. The first division of the Supreme Court has held that the husband is a competent witness to a business conversation with his wife in the presence of a third person. [Long v. Martin, 152 Mo. 668.] That ruling is in accord with general principles of the law of this subject as shown in judicial expressions elsewhere. [Allison v. Barrow, 3 Coldw. 417; Lyon v. Prouty, 154 Mass. 488.] We hold that the offer of the testimony in question should have been favorably entertained.''

The defendant in this cause expressly stated that the details of the account of how the little girl, Pearl Smith, came to her death, as made in his presence, were true. This express admission is of the same effect and force against the defendant as if he had detailed the account in full himself, and our conclusion is that this testimony was properly admitted.

## VI.

Finally it is insisted by appellant that the testimony introduced in this cause is insufficient to support the verdict.    We have in the statement of this case sufficiently indicated the nature and character of the testimony introduced for the State as well as the defendant; hence there is no necessity in discussing this contention to repeat the evidence.    It is sufficient to say that if the defendant inflicted the injuries upon this less-than-two-year-old child in the manner as indicated by the testimony and her death resulted from such injuries, we have no hesitancy in saying that such acts could not proceed but from a bad heart, and, as was said by Mr. Blackstone, was equivalent to a deliberate act of slaughter.    On the other hand, if the testimony on the part of the defendant while a witness upon the stand, together with the other testimony introduced in the cause, is to be relied upon, then he was not guilty of any offense.

There was ample testimony to submit this cause to the jury and it was their province to pass upon the credibility of the witnesses as well as the weight to be attached to their testimony.    If the jury after a careful consideration of this cause believed that the testimony introduced on the part of the State was substantially true, then in our opinion it furnished full support for the conclusions reached by them.

We have so repeatedly at each term of the court announced the rule that we will not undertake to retry the cause in this court upon the disclosures of the record, where there is substantial testimony to support the verdict, that there is no need of the citation of authorities, and the finding of the jury will not be disturbed on the ground that there may be conflict in such testimony.

We have given expression to our views after a most careful consideration of all the questions involv-

ed, as disclosed by the record, which results in the conclusion that the judgment of the trial court should be affirmed and it is so ordered.

All concur.