**STATE of Missouri, Respondent,**

v.

**James ROULETTE, Jr., Appellant.**

**No. 54612.**

Supreme Court of Missouri,
Division No. 2.

March 9, 1970.

John C. Danforth, Atty. Gen., Charles A. Blackmar, Asst. Atty. Gen., Jefferson City, Mo., for respondent.

Michael D. Konomos, Kansas City, Mo., for appellant.

BARRETT, Commissioner.

A jury found the appellant, James Roulette, Jr., guilty of murder in the first degree and fixed his punishment at life imprisonment. The indictment charged that on November 11, 1967, George Brown, Charles Burch, James Johnson and Roulette made an assault upon, shot and killed Emil Dean Kays with a .38-caliber Smith and Wesson revolver.

In brief the circumstances were that Kays, a General Motors employee, and Eva Young were to have been married on Monday, November 13, 1967. On Friday, November 10th Eva got off from work about 4 o'clock and met Emil "down on Troost,"

then they went out on Raytown Road and danced and finally stopped at the Brass Rail at 34th and Troost and visited a friend. They were driving separate cars but were to meet in front of Eva's apartment a short distance away, 1205 East 34th Street. Eva went ahead and when Emil went to drive his car away the driveway was temporarily blocked by a wrecked automobile and so he decided to walk the few blocks to Eva's apartment. A Miss Morrison who then lived at 35th and Campbell had been to a party and was walking home, west on 34th Street about midnight. She was between Tracy and Forest when she saw a man "standing there" on the other side of the street and suddenly there were "a couple of shots" and she saw "two guys" standing over the man on the ground, one of them with a gun in his hand. She saw that the two men were Negro males and immediately a 1957 pink and white Cadillac with two men in it came from Troost on 34th Street, turned right at Forest and the two running males "jumped in the car" and drove away. There was a street light on the corner and she could plainly see the automobile and the two men even though she could not identify them. Miss Morrison walked up to the man on the ground who said that he had been shot and robbed and immediately called the police who arrived on the scene in a matter of minutes, about 12:15 on November 11th. When Emil did not show up in a few minutes Eva drove around the block and arrived on the scene with the police. A "pickup order" for a 1957 pink and white Cadillac went out and at 4:30 police officers found such a vehicle on a parking lot at 2943 Prospect (Byron Hotel). They kept the automobile under observation and at 5:40 three men emerged from the hotel and as they got into the car the police arrested them. These three men were James Johnson, Roulette on the driver's side and Burch. The arresting officers took a .38-caliber Smith and Wesson gun from Johnson. At Emil's autopsy a bullet was removed from his spine and a ballistics expert said that it had been fired from the gun found in Johnson's possession.

Roulette, also a General Motors employee, denied any connection with the robbery and murder. He claimed that he went home from work and stayed there until about 4 o'clock in the morning when Johnson called and asked him "to come and pick him up and take him home" although "home" was but a short distance. He said that his own automobile had a flat tire and so he borrowed his brother-in-law's pink and white Cadillac. And, he says that while he was in the Byron Hotel waiting Johnson "was talking to some guy and they exchanged some money for a pistol." To his surprise, as they got in the Cadillac, police arrested him along with Johnson and took them to the police station where detectives questioned them. There was and is no question about Miranda warnings or other rights, they were given repeatedly and Roulette said "I told him (Detective Meyer) I knew my rights and I knew I didn't have to say anything and I knew that I hadn't done anything. He asked me to sign the paper and I told him, 'I have no business signing anything.'"

The police officers deny that written statements were taken from anyone. They say that after all the warnings as read from a card, they first unsuccessfully questioned Roulette alone. Later they questioned Johnson in Roulette's presence and it is in this connection that the only questions involved upon this appeal arose. Officers Meyer, Layman and Jenkins talked to Johnson and Detective Horner took notes. In brief Johnson said that in the evening of the 10th he, Brown, Burch and Roulette in a pink and white Cadillac left a party and "decided they would go and make some money, rob someone." And so they drove around 34th and Forest and 35th and Troost "but the time was not right" to rob anyone and they returned to the party. Later, around midnight, they returned to the area and "(t)hey observed a white man walking down the street." At that time Roulette pulled over to the curb

and Charles Burch and James Johnson got out of the car and proceeded to follow this man and followed him around the corner to 34th and Forest. The man walked out into the middle of the street. At that time Charles Burch went and approached the man from the front, James Johnson approached him from the rear. Johnson then stated that the man pulled a revolver, what he thought to be a .22 (no such weapon was found on Emil) and pointed it at Charles Burch, so he shot him in the back. The man turned around and looked at James Johnson and at that time he shot him again and he fell to the ground. They then went through his pockets, Charles Burch was supposed to have removed the .22 revolver and taken it, and they removed $4.00 from the man's billfold and took his billfold, also. They then ran back to the car, got in the car, and they drove back to the party at 35th and Michigan and finally to the Byron Hotel "to see some girls" and were arrested when leaving.

Upon this appeal the principal point made in behalf of Roulette is that the court prejudicially erred in admitting in evidence through the testimony of the police officers Johnson's oral statement or confession all of which had been embodied in a police report. It is said that the testimony of the police officers was hearsay and in any event that its use infringed Roulette's Sixth Amendment rights "to be confronted with the witnesses against him" as well as the state constitutional right "to meet the witnesses against him face to face." Const. of Mo. Art. I, Sec. 18(a), V.A.M.S. In short it is contended that the case falls within the ban of Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476; Pointer v. Texas, 380 U.S. 400, 85 S.Ct. 1065, 13 L.Ed.2d 923, and Douglas v. Alabama, 380 U.S. 415, 85 S.Ct. 1074, 13 L.Ed.2d 934. Appellant's counsel rely on these excerpts from the Bruton case, an armed postal robbery, "because of the substantial risk that the jury, despite instructions to the contrary, looked to the incriminating extrajudicial statements in determining petitioner's guilt, admission of Evans' confession in this joint trial violated petitioner's right of cross-examination secured by the Confrontation Clause of the Sixth Amendment."

The state contends, because as the officers questioned Johnson, Roulette heard the questions and answers or Johnson's recitation and "indicated" by nodding affirmatively after questions to him by the officers ("Is that right?"), that thereby "adopting the statement as his own." In this connection, the state urges that the circumstances fall within the doctrine of "adoptive admission" as proposed by Rule 507(b) of the Model Code of Evidence (1942). And see McCormick, Evidence, Sec. 246, p. 525. It is not necessary to elaborate on this proposed rule, the commentator says "(t)he theory of adoptive admissions is that the hearsay declaration is in effect repeated by the party; his conduct is intended by him to express the same proposition as that stated by the declarant." Model Code of Evidence, p. 181; McCormick, p. 525.

These opposing views have been set forth at some length to indicate awareness of the theory and doctrine of "adoptive admission" on the one hand and the binding force and effect of the decisions of the Supreme Court of the United States on the other hand. It is not necessary to distinguish this and the Bruton case factually—they are indeed vastly different. Neither is it necessary to consider the validity of the theory of adoptive admissions and whether under the Bruton case the doctrine is possible. In the circumstances of this particular case and upon this particular record the testimony of the police officers does not fall within the ban of the one rule (the Bruton case) or necessarily within the sanction of the other rule (adoptive admissions). In the circumstances of this particular record the testimony was properly admissible under generally recognized principles and therefore, of course, was not prejudicially erroneous.

Careful examination of the record reveals that there were not alone detailed

questions to Johnson and mere nodding assent by Roulette. It is true that Meyer once said that Roulette "didn't actually make any statements. James Johnson made a statement and he just sat there and listened." And at another point Meyer said "and during this statement James Johnson would give, we would look over at him and ask if that was right and he would just nod." But then Meyer said, as a part of the latter quotation, "and *at the end he said the only change was that he heard the shots but was not aware of who was shot and that he was setting in the car all the time.* Q. Did he state who was driving? A. *He stated he was driving.* Q. Did he state whose gun it was? A. *He stated it was his gun, he loaned it to James Johnson.* * * * MR. BARBIERI (defendant's trial counsel): *He is actually saying these things, is that what you are saying, Officer?* A. *Yes. This was at the end.* * * * Q. And then at the end, after Johnson completed, *the defendant stated that there were some things he didn't know who was shot, he wasn't out of the car?* A. *That's right.* Q. And it was his gun? A. Yes." And then after Officer Meyer related the content of Johnson's statement there was the following: "Q. And did you ask Roulette if that was correct? A. Yes, we did. Q. *What changes, if any, did he make?* A. *At the end he said the only change was that he did not get out of the car; he heard three or four shots but he did not know who was shot or if anyone was shot, he did not know who they shot; and he was driving the car and that it was his gun which he loaned to Johnson."*

It should be interpolated at this point that the court made a specific and separate finding that "the statement was freely and voluntarily given by the defendant after being fully advised of his constitutional rights," that is, his right not to make a statement, his right to an attorney, and again "that he was not subject to any threats or intimidation, and the statement was freely and voluntarily made, and the finding of the Court is that the record shows this to be true beyond any reasonable doubt."

Officer Horner who took notes of the interrogation said, "Q. Did he (Roulette) make any statement at that time? A. I asked him, 'Is this (Johnson's statement) right?' and he said yes, *it was all right except he waited in the car, that he did not know who they robbed, but he did know they were going to rob somebody.* He did not know that they were going to shoot anybody. He did hear three or four shots and then James Johnson and Charles Burch ran back to the car. *He was asked what happened to the victim's billfold and he stated that they threw it in a sewer. I asked him where at, and he stated he didn't know, but he knew it was in Missouri."*

In these circumstances, as in State v. Wilson, Mo., 286 S.W.2d 756, in which the appellant claimed error in permitting a police officer to testify to what "Haney said concerning defendant's part in the theft after Haney, Smith, and defendant had been arrested and while the three were being questioned by officers," the court said, "far from remaining silent, defendant affirmatively concurred in most of Haney's statement *and affirmatively corrected one portion in the detail noted."* (Emphasis supplied.) And in State v. Cooley, Mo., 221 S.W.2d 480, the court said, "The evidence was that defendant Cooley read the statement or confession of defendant Spencer and then said that it was a true statement of the facts." In State v. Wooley, 215 Mo. 620, 115 S.W. 417, the defendant killed his stepchild. The defendant's wife, charged as an accessory, had given a statement which was read to the defendant and "Mr. Wooley said this statement, in regard to the treatment of the child, *that one or two of the little things there were not correct, but that most of the statement was correct."* The statement was again read to Wooley and he "said that it was true with one or two minor exceptions. *The exceptions he made to it were:* He said that when they were at the spring that she volunteered to go and do the milking, and she had said in her statement that he told her

to go do the milking; and she had said that he had said to be sure to go and see how Pearl (the baby stepchild) was, and he said that he didn't tell her to go and see how Pearl was." In these circumstances the court ruled that "this statement was properly admitted in evidence, and this conclusion is based upon the admission of the defendant in the presence of witnesses that the statement as made was true. * * * When this statement was made and read in the presence of the defendant and in the presence of others, together with his wife, and he expressly admitted that such statements were true, that in effect amounted to an adoption of the statement as his own." (215 Mo. l.c. 684–685, 115 S.W. l.c. 438). And, finally, "The confessions of Seward were made in the presence of appellant, who, according to the testimony, acquiesced in and approved them. Such confessions in a measure became his confessions." State v. Hayes, Mo., 247 S.W. 165, 168, and State v. Capotelli, 316 Mo. 256, 263, 292 S.W. 42, 45. And, in the end that is the situation here, irrespective of Johnson's statements Roulette himself not only made emendations he plainly and specifically and on his own made certain independent incriminating statements, that he drove the pink and white Cadillac, that the purpose of the trip was robbery, that it was his gun, and that Emil's billfold was thrown into a sewer.

There was no attempt to separate or eliminate any part of any of the oral statements, from the outset and throughout the trial it has been, as stated, the defendant's position that the admissions in their entirety were to be excluded because they fell within the ban of the Bruton case. In this situation the court gave the conventional instruction on the admissibility and voluntariness of a confession. The defendant offered no modifying instruction or an instruction particularly directed to the circumstances of this case and Johnson's and defendant's oral admissions. He complains, however, that the court erred in giving noted Instruction 9 because it "did not submit the question if this oral confes-

sion of the accomplice was voluntary and true, but if not so found, then the statement was not binding as (to) this defendant." It may be insofar as there was an "oral adoptive admission" that the appellant was entitled to a cautionary and delimiting instruction, (State v. Cooley, Mo., 221 S.W.2d 480, 485). "But no such instruction was sought or given here." Naples v. United States, 120 U.S.App.D.C. 123, 344 F.2d 508, 512.

Also in this posture and independently of appellant's admissions, there was, contrary to his claim, proof of the corpus delicti, proof of "both the criminal act and the criminal agency of the defendant" and of course supporting the jury's finding and verdict. State v. Falbo, Mo., 333 S.W.2d 279. And, accordingly, the judgment is affirmed.

STOCKARD and PRITCHARD, CC., concur.

PER CURIAM.

The foregoing opinion by BARRETT, C., is adopted as the opinion of the court.

DONNELLY, P. J., MORGAN and FINCH, JJ., and HENLEY, Alternate Judge, concur.